**IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION**

IN RE:

**ASPEN VILLAGE AT LOST MOUNTAIN
ASSISTED LIVING, LLC,**

      **Debtor.**

**CHAPTER 11**

**CASE NO. 19-40262-BEM**

## SUPPLEMENT TO DISCLOSURE STATEMENT

COMES NOW Aspen Village at Lost Mountain Assisted Living, LLC ("Debtor"), and hereby supplements its Disclosure Statement[1] (Doc. No. 75) referring to a Plan (Doc. No. 76) to provide as follows.

1.      Debtor supplements the Disclosure Statement to include the following information requested by MidCap Funding Investment IV, LLC ("MidCap").

2.      **Debtors Efforts To Increase Occupancy:**

On the Filing Date, Debtor's unit occupancy was 61 units.  During the course of the case, Debtor has worked diligently along with Canopy Management, LLC ("Canopy") to increase occupancy.  In the months leading up to the Bankruptcy, the stalled construction of the Memory Care building coupled with the foreclosure advertisements put a severe strain on Debtor's ability to attract and maintain occupants. The cessation of the foreclosure ad by virtue of the Bankruptcy has aided Debtor's efforts to stabilize and increase occupancy.  However, the Bankruptcy and the continued stalled construction at Memory Care have continued to effect Debtor's efforts to increase occupancy.  Despite such obstacles, as of June 28, 2019, Debtor's unit occupancy has increased to 69 units.  Debtor projects that occupancy will continue to increase as Debtor emerges from Bankruptcy and can instill a further sense of security regarding its continued operations to

---

[1] Capitalized terms not otherwise disclosed herein shall have the meaning ascribed to the same in the Disclosure Statement.

occupants and prospective occupants. There are a number of strategies that Debtor together with the Canopy will deploy to accomplish the goal of 90% occupancy post-petition including:

- continuous upgrades to the physical structure, which drives client satisfaction and facilitates retention of current residents;

- focus on retention by emphasizing great services and quality staffing and programs;

- quarterly marketing campaigns to encourage new occupants;

- continuing to market respite services, which are short-term rehab residents, as respite residents are potential long-term residents; and

- Memory Care intends to re-start construction of its facility, which will allow for easier marketing of Debtor's facility.

Importantly, if there is a delay in reaching 90% occupancy, Debtor can still meet its expenses and plan payments by actions including:

- increasing marketing for adult daycare services, which can increase revenue by a minimum of $1,500 per individual each month with minor increased costs;

- expanding internal services for residents to include upgrades in menu items for premium meal dining experiences where family members are invited to dine for pay; and

- continuing to market the convenience of furnished rooms which adds an additional $400 to monthly rental fees.

      3.      **Details of Debtor's Resident Agreements.**

      Debtor's occupancy as of June 28, 2019 is 69 units occupied.  The details of Debtor's occupancy are included in Exhibit "1" hereto. Debtor's occupants are parties to a Resident Agreement.  A sample Resident Agreement is attached hereto as Exhibit "2."

      4.      **Efforts to Obtain Construction Financing and Timeline**.

      Debtor has been in discussion with numerous investors and or lenders regarding obtaining a construction loan.  While many such parties have expressed an interest in a loan or investment,

closing on any such transaction has proven difficult pre-confirmation, as parties are not interested in expending significant resources on a transaction until a plan has been confirmed.

5.    **Intercompany Loans.**

Debtor's schedules identify intercompany loans owed to Debtor by Memory Care.  Memory Care has no sources of income.  Accordingly, Debtor funded or advanced money for the payment of various Memory Care expenses including: payments on loans secured by Memory Care's real estate, monies toward the purchase of Memory Care's land, development costs, surveys and environmental studies, site work, debt service payments to MidCap on construction draws, ad valorem taxes and payment of default interest, penalties and fees to MidCap.  The current balance due to Debtor from Memory Care is $3,867,921.73.

6.    **Valuation of Potential Lawsuits Against MidCap and Zambetti.**

Debtor discloses that it intends to retain causes of action or claims against MidCap Funding Investment IV, LLC and/or its affiliates for lender liability, including tortious interference with contractual relations (i.e. Canopy Lifestyles, LLC and others as may be discovered). Debtor has not hired counsel to review those claims at this juncture. However, Debtor shows that MidCap exercised unreasonable control over Debtor and its co-borrower, Memory Care, and in the exercise of such unreasonable care harmed Debtor and Memory Care and ultimately caused the cessation of the project at Memory Care unjustifiably and unreasonably.  Additionally, prior to the Filing Date, MidCap approached Canopy Lifestyles, LLC, Debtor's third party management company, regarding hiring Canopy Lifestyles, LLC as MidCap's management company after a foreclosure of Debtor's assets.  Debtors reserves and any all claims related to the same, including that such communications and actions and any other communications and actions with parties to contracts with Debtor or business relationships with Debtor constitutes tortious interference with business and/or contractual relationships.  Debtor has not valued such claims, and any asserted valuation by Debtor would be speculative.

Debtor additionally discloses claim against John Zambetti for payment of $112,5000 of the proceeds from the Realty Resources, NAMM Holding, LLC, and LIA Funding LLC loans (collectively the Real Resource Loans), and reimbursement of interest payments Debtor made to the holder of such loans. Debtor values the potential judgment under such a claim in the face amount of at least $112,500.00, which is the amount of money that John Zambetti received from the proceeds of the Realty Resource Loans. However, Debtor does not know the collectability of any such claim, and any estimation would be speculative.

7. **Debtor's Valuation of the Fixtures, Furnishings and Equipment.**

In Schedule B Debtor filed with the Court, Debtor lists Fixtures, Furnishings and Equipment ("FF&E") with a book value of $230,124.85, which is calculated by subtracting any accumulated depreciation from an asset's purchase price or historical cost. The book value does not represent the market value. MidCap commissioned an appraisal of Debtor's real estate and business, which determined a market value of $410,000.00 for Debtor's FF&E as of July 31, 2018. A copy of the MidCap appraisal is available on the docket as Doc. No. 42-1.

8. **Debtor's Efforts to Market its Assets.**

Debtor's plan is to pay its creditors in full following completion of the Memory Care facility and stabilization of Debtor's facility so as to maximize value. Debtor has engaged Anthony Williams of Marcus Millichap, Inc. as Debtor's broker in this case. Mr. Williams has heard from numerous interested parties; however, in order to pay all creditors in full, Memory Care must first complete construction of its facility and open its doors. Debtor anticipates that sufficient occupancy will be reached by Debtor and Memory Care by 18-24 months post-confirmation to attract investors and buyers at a level capable of providing a full return to creditors. Accordingly, Debtor's Plan provides a 36-month post-confirmation term on MidCap's secured claim to allow time for completion of Memory Care, sufficient occupancy at Debtor and Memory Care, and marketing and closing of a transaction to pay MidCap' secured claim. Debtor and Memory Care are in discussion with some investors regarding making capital investments for the Memory Care

construction whereby such investors would ultimately purchase or the refinance the asset post-completion.  In addition, as Debtor and Memory Care have robust interest in their assets currently, Debtor and Memory Care will maintain contact with these interested parties throughout the construction and stabilization timeline so that this project remains on their radar.

9.    **Sale Procedures**

After the Confirmation Date, Debtor is authorized to sell or refinance its assets, specifically including its real property, free and clear of liens, claims and encumbrances as set forth herein (the "Sale Procedures") provided Allowed Secured Claims are paid in full at the sale, or the Holder of such Allowed Secured Claim expressly agrees in writing to release its Allowed Secured Claim for less than full payment.   In the event the applicable assets are subject to secured claims, Debtor is authorized to sell or refinance such property free and clear of liens, claims and encumbrances on the following terms:

(i)    If selling or refinancing the entire property, Debtor may sell or refinance such property for any amount (a release amount) that is at least equal the outstanding amount of Allowed Secured Claims securing such property; and

(ii)    If selling or refinancing a portion of the property, such as a lot or portion of the acreage, Debtor may sell or refinance such property for any amount (a release amount) that is at least equal to the outstanding amount of Allowed Secured Claims securing such property.

Such amounts are referred to in the Plan as the "Release Amount."  The Release Amount, after payment of customary closing costs including broker fees and other items customarily attributed to the seller (in a sale) and borrower (in a refinancing), shall be paid as follows: (i) first to cover any *ad valorem* property taxes associated with the particular asset, (ii) then secured claims in order of priority, and (iii) then to fund Debtor's other obligations as set forth in the Plan.

The Bankruptcy Court shall retain jurisdiction to reopen the Bankruptcy Case, if applicable, and resolve any disputes regarding the Sale Procedures herein.

10.    **MidCap 7.5% interest rate.**

Debtor selected 7.5% by taking the national prime rate of interest and selecting a risk factor.  Due to the Class A quality collateral and Debtor's increasing operations, Debtor shows that 7.5% is an appropriate interest rate for MidCap's secured claim.

Respectfully submitted this 2nd day of July, 2019.

**JONES & WALDEN, LLC**

*/s/ Leslie M. Pineyro*
Leslie M. Pineyro
Georgia Bar No. 969800
Leon S. Jones
Georgia Bar No. 003980
21 Eighth Street, NE
Atlanta, Georgia  30309
(404) 564-9300
Attorneys for Aspen Village at Lost Mountain
Assisted Living, LLC
lpineyro@joneswalden.com

# EXHIBIT "1"

Community: **Lodge at Aspen Village**
Location: **Dallas, GA**

Report Date: **6/28/19**

Month of Report: **June**
Days in Month: **30**
Last Day of Month: **6/30/19**

Today's Date **6/28/19**

*Naming convention: Cmty-Master Occupancy-Summary-Rent Roll-00112017 (Today's Date using exact format shown)*
*Numeric data entry only in highlighted fields. No alphabetical characters.*

Current Census: **69**
Current Occ%: **78.41%**
Total Billing (incl. dev receipts): **$252,846**
Potential Billable Days: **2640**
Billable Days: **2,028**

| Monthly Market Rate 6/1/17 | Suite/Apt Number | Suite/Apt Type | Resident Name | Move-in Date | Monthly Rate | Med Assist | LOC 1 | LOC 2 | LOC 3 | Incont Mgmt | 2nd Resident | 2nd Resident Med Assist | 2nd Resident LOC | Misc | 2nd Resident Incont Mgmt | Monthly Total | Monthly Mkt Rate Variance (+/-) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $3,995 | 100 | 1 BR | | 8/15/17 | $3,000 | | $250 | | | | | | | | | $3,250 | -$745 |
| $3,995 | 101 | 1 BR | | 4/2/15 | $3,385 | | | | | | | | | | | $4,170 | $175 |
| $3,995 | 102 | 1 BR | | 1/26/17 | $3,995 | | | $775 | | | $900 | | | | | $5,270 | $1,275 |
| $3,995 | 103 | 1 BR | | 9/6/18 | $3,495 | | | $375 | | | | | | | | $3,495 | -$500 |
| $4,695 | 104 | 2 BR | | 2/27/18 | $2,895 | | | | | | $2,495 | | | | | $5,190 | $495 |
| $4,695 | 105 | 2 BR | | 4/26/16 | $4,695 | | $375 | | | | $900 | | | | | $5,970 | $1,275 |
| $3,795 | 106 | 1 BR | | 5/18/17 | $3,995 | | $375 | | | | | | | | | $4,370 | $575 |
| $3,795 | 107 | 1 BR | | 8/11/15 | $3,400 | | $375 | | | | | | | | | $3,775 | -$20 |
| $3,795 | 108 | 1 BR | | 10/31/18 | $3,795 | | | | | | | | | | | $3,795 | $0 |
| $3,795 | 109 | 1 BR | | 8/17/13 | $3,295 | | | $750 | | | | | | | | $4,045 | $250 |
| $3,795 | 110 | 1 BR | | 7/6/17 | $3,550 | | $375 | | | | | | | | | $3,925 | $130 |
| $3,795 | 111 | 1 BR | | 5/20/19 | $3,395 | | $375 | | | | | | | | | $3,770 | -$25 |
| $3,995 | 112 | 1 BR Lg | | 10/1/16 | $3,995 | | | $775 | | | | | | | | $4,770 | $775 |
| $3,995 | 120 | 1 BR Lg | | 6/27/17 | $3,795 | | $375 | | | | | | | | | $4,170 | $175 |
| $3,795 | 121 | 1 BR | | 6/17/17 | $3,795 | | $375 | | | | | | | | | $4,170 | $375 |
| $3,795 | 122 | 1 BR | | 2/28/17 | $3,495 | | $375 | | | | | | | | | $3,870 | $75 |
| $3,795 | 123 | 1 BR | | 7/28/16 | $3,495 | | | | | | | | | | | $3,495 | -$300 |
| $4,695 | 130 | 2 BR | | | | | | | | | | | | | | $0 | $0 |
| $3,795 | 131 | 1 BR | | | | | | | | | | | | | | $0 | $0 |
| $3,795 | 132 | 1 BR | | | | | | | | | | | | | | $0 | $0 |
| $3,795 | 133 | 1 BR | | 3/1/19 | $3,195 | | $375 | | | | | | | | | $3,570 | -$225 |
| $3,795 | 134 | 1 BR | | 1/26/17 | $3,495 | | $375 | | | | | | | | | $3,870 | $75 |
| $3,795 | 140 | 1 BR | | 2/19/18 | $3,495 | | | | | | | | | | | $3,495 | -$300 |
| $3,795 | 141 | 1 BR | | 12/1/17 | $3,495 | | $375 | | | | | | | | | $3,870 | $75 |
| $3,795 | 142 | 1 BR | | 7/6/17 | $3,495 | | | | | | | | | | | $3,495 | -$300 |
| $3,795 | 143 | 1 BR | | | | | | | | | | | | | | $0 | $0 |
| $3,795 | 200 | 1 BR | | 2/1/18 | $3,395 | | $375 | | | | | | | | | $3,770 | -$25 |
| $3,795 | 201 | 1 BR | | 12/16/16 | $3,395 | | | | | | | | | | | $3,395 | -$400 |
| $3,795 | 202 | 1 BR | | 12/20/16 | $3,495 | | $375 | | | | | | | | | $3,870 | $75 |
| $3,795 | 203 | 1 BR | | 6/1/14 | $3,445 | | | | | | | | | | | $3,445 | -$350 |
| $4,695 | 204 | 2 BR | | 3/20/15 | $2,495 | | $375 | | | | | $2,025 | | | | $4,895 | $200 |
| $4,695 | 205 | 2 BR | | | | | | | | | | | | | | $0 | $0 |
| $3,795 | 206 | 1 BR | | 3/30/19 | $3,195 | | $400 | | | | | | | | | $3,595 | -$200 |
| $3,795 | 207 | 1 BR | | | | | | | | | | | | | | $0 | $0 |
| $3,795 | 208 | 1 BR | | 2/19/16 | $3,995 | | | | $600 | | | | | | | $4,595 | $800 |
| $3,795 | 209 | 1 BR | | 11/11/17 | $2,695 | | $375 | | | | | | | | | $3,070 | -$725 |
| $3,795 | 210 | 1 BR | | 5/12/18 | $3,995 | | | $500 | | | | | | | | $4,495 | $700 |
| $3,795 | 211 | 1 BR | | 5/21/19 | $3,375 | | $375 | | | | | | | | | $3,750 | -$45 |
| $3,995 | 212 | 1 BR Lg | | | | | | | | | | | | | | $0 | $0 |
| $3,995 | 213 | 1 BR Lg | | | | | | | | | | | | | | $0 | $0 |
| $3,795 | 220 | 1 BR | | 5/18/19 | $3,200 | | $375 | | | | | | | | | $3,575 | -$220 |
| $3,795 | 221 | 1 BR | | | | | | | | | | | | | | $0 | $0 |
| $3,795 | 222 | 1 BR | | 2/18/16 | $3,795 | | $375 | | | | | | | | | $4,170 | $375 |
| $3,795 | 223 | 1 BR | | 1/5/15 | $3,395 | | $375 | | | | | | | | | $3,770 | -$25 |
| $4,695 | 230 | 2 BR | | | | | | | | | | | | | | $0 | $0 |
| $3,795 | 240 | 1 BR | | | | | | | | | | | | | | $0 | $0 |
| $3,795 | 241 | 1 BR | | 3/27/18 | $3,500 | | | $400 | | | | | | | | $3,900 | $105 |
| $3,795 | 242 | 1 BR | | 2/19/16 | $3,795 | | $375 | | | | | | | | | $4,170 | $375 |

| Rate | Unit | Type | Date | Amount | | | | | Total | Variance |
|---|---|---|---|---|---|---|---|---|---|---|
| $3,795 | 243 | 1 BR | 6/1/19 | $2,695 | | $500 | | | $3,195 | -$600 |
| $3,795 | 250 | 1 BR | 5/7/14 | $2,895 | $250 | | | | $3,145 | -$650 |
| $3,795 | 252 | 1 BR | 7/6/18 | $3,495 | $400 | | | | $3,895 | $100 |
| $3,795 | 253 | 1 BR | 6/15/15 | $3,385 | | $775 | | | $4,170 | $375 |
| $3,795 | 254 | 1 BR | 5/5/18 | $3,495 | | | | | $3,495 | -$300 |
| $3,795 | 256 | 1 BR | 8/20/17 | $3,495 | | $775 | | | $4,270 | $475 |
| $3,795 | 257 | 1 BR | | | | | | | $0 | $0 |
| $3,795 | 258 | 1 BR | 1/21/16 | $3,795 | | $775 | | | $4,570 | $775 |
| $3,795 | 259 | 2 BR | 3/14/19 | $2,595 | $400 | | $2,500 | $385 | $5,880 | $2,085 |
| $3,795 | 260 | 1 BR | 8/17/18 | $3,495 | | | | | $3,495 | -$300 |
| $3,595 | 150 | SL Studio | 7/29/18 | $2,495 | | | | | $2,495 | -$1,100 |
| $3,595 | 152 | SL Studio | 8/30/18 | $2,695 | $375 | | | | $3,070 | -$525 |
| $3,595 | 154 | SL Studio | 2/2/19 | $2,795 | | | | | $2,795 | -$800 |
| $4,795 | 156 | SL Studio | 8/1/18 | $2,252 | | | | | $2,252 | -$2,543 |
| $4,795 | 158 | MC Studio | 6/24/19 | $3,995 | | | | | $932 | -$187 |
| $4,795 | 159 | MC Studio | | | | | | | $0 | $0 |
| $4,795 | 160 | MC Studio | | | | | | | $0 | $0 |
| $4,795 | 161 | MC Studio | | | | | | | $0 | $0 |
| $4,795 | 162 | MC Studio | 2/19/18 | $2,995 | | | | | $2,995 | -$1,800 |
| $4,795 | 163 | MC Studio | 8/18/18 | $3,795 | | | | | $3,795 | -$1,000 |
| $4,795 | 164 | MC Studio | 10/28/18 | $3,795 | | | | | $3,795 | -$1,000 |
| $4,795 | 165 | MC Studio | 8/3/18 | $3,795 | | | | | $3,795 | -$1,000 |
| $4,795 | 166 | MC Studio | 4/19/19 | $2,400 | | | | | $2,400 | -$2,395 |
| $4,795 | 168 | MC Studio | 6/7/19 | $3,995 | | | | | $3,196 | -$640 |
| $4,795 | 170 | MC Studio | | | | | | | $0 | $0 |
| $4,795 | 171 | MC Studio | 5/9/17 | $3,995 | | | | | $3,995 | -$800 |
| $4,795 | 172 | MC Studio | 2/23/19 | $4,795 | | | $200 | | $4,995 | $200 |
| $4,795 | 173 | MC Studio | 12/2/14 | $4,795 | | | | | $4,795 | $0 |
| $4,795 | 174 | MC Studio | | | | | | | $0 | $0 |
| $4,795 | 175 | MC Studio | 6/27/17 | $3,995 | | | | | $3,995 | -$800 |
| $4,795 | 180 | MC Studio | | | | | | | $0 | $0 |
| $4,795 | 182 | MC Studio | | | | | | | $0 | $0 |
| $4,795 | 184 | MC Studio | | | | | | | $0 | $0 |
| $3,595 | 185 | MC Studio | 8/1/18 | $3,795 | | | | | $3,795 | $200 |
| $3,595 | 190 | SL Studio | 7/30/18 | $2,495 | | | | | $2,495 | -$1,100 |
| $3,595 | 191 | SL Studio | 3/15/19 | $2,795 | $400 | | | | $3,195 | -$400 |
| $3,595 | 192 | SL Studio | 8/3/18 | $2,500 | | | | | $2,500 | -$1,095 |
| $3,595 | 193 | SL Studio | 5/11/19 | $2,795 | | | | | $2,795 | -$800 |
| $3,595 | 194 | SL Studio | 6/15/19 | $2,795 | | | | | $1,491 | -$427 |
| $3,595 | 195 | SL Studio | 3/15/19 | $2,495 | | $400 | | | $2,895 | -$700 |

| | |
|---|---|
| Total AL | 68 |
| AL Occ | 56 |
| Vacancy | 12 |
| Occ % | 82.35% |
| Total MC | 20 |
| MC Occ | 13 |
| Vacancy | 7 |
| MC Occ % | 65.00% |

| | |
|---|---|
| 88 | Total Apts/Suites |
| 104 | Licensed Capacity |
| 82 | Budgeted Capacity |

# EXHIBIT "2"

## PERSONAL CARE & MEMORY CARE

## RESIDENCY AGREEMENT

**THIS RESIDENCY AGREEMENT** ("Agreement") is made and entered into this

____ day of _____, 20 __ by and between the parties to this

Residency Agreement:

(i)      The Community, ***ASPEN VILLAGE AT LOST MOUNTAIN ASSISTED LIVING, LLC** doing business as **THE LODGE AT ASPEN VILLAGE,***

(ii)     Resident,                    _____

(iii)    Resident's Representative,  _____

(iv)    Responsible Party, _____

(Resident and Resident's Representative are collectively referred to in this Agreement as "you" or "Resident").

## ARTICLE I
## COMMUNITY, RESIDENT'S REPRESENTATIVE & RESPONSIBLE PARTY DEFINED

**A.      Community**

(v)      The "Community" is defined as ***ASPEN VILLAGE AT LOST MOUNTAIN ASSISTED LIVING, LLC** doing business as **THE LODGE AT ASPEN VILLAGE,*** along with all affiliates, subsidiaries, joint ventures and joint venture partners, employers, employees, owners, landlords, managers, officers, directors, administrators, medical directors, contract service providers, agents, partners, members and incorporators, licensees, management companies, holding companies, parent corporations, consultants, lenders, investors, insurers, real estate property owners, attorneys, representatives, stakeholders and all other persons natural or corporate in privity with them, (hereafter referred to collectively as "Community").

**B.      Resident's Representative**

If the person signing this Residency Agreement is not the Resident, the Community both requires and relies upon the representation by the person that signs this Agreement, as Resident's Representative, that he or she has been authorized by the Resident to enter into and bind the Resident to each and every term and condition of this Residency Agreement and its Exhibits, both financial and non-financial, without any restriction whatsoever. Resident's Representative agrees and understands that he or she is signing this Residency Agreement and its Exhibits, in both a representative and

individual capacity. **However, please note that Resident's Representative does not assume any personal financial liability for the debts of the Resident under this Residency Agreement unless he or she also serves as the Responsible Party** (see **Section C).** In consideration of these representations by Resident's Representative, the Representative understands and acknowledges that the Community will seek to enforce, without exception, the terms and conditions of this Residency Agreement and its Exhibits in full and reasonable reliance thereon. Accordingly, by his or her signature on this Residency Agreement, the Resident's Representative hereby agrees to indemnify and hold harmless the Community, its trustees, officers, administrators, medical director, attending physicians, nurses and other personnel for any of their enforcement costs, including but not limited to, their reasonable attorneys' fees and costs, arising out of or relating to a dispute wherein the Resident, Resident's Representative, Responsible Party or any other beneficiary, successor, or assign of this Residency Agreement challenges or opposes the authority of the Representative to bind the Resident to each and every term and condition of this Residency Agreement and its Exhibits.

## C.    Responsible Party

Resident has designated the Responsible Party named above as Responsible Party under this Residency Agreement. Resident and Responsible Party have agreed that Responsible Party will fulfill the obligations, both financial and non-financial, set forth in **Exhibit D** ("Responsible Party Agreement"). In the event that Resident is financially incapable of fulfilling his/her obligations under this Residency Agreement, Responsible Party agrees to fulfill Resident's financial obligations using Responsible Party's own finances and assets. In addition, Resident and Responsible Party agree that Responsible Party is bound to all of the terms of this Residency Agreement and its Exhibits.

## ARTICLE II
## INTRODUCTION TO YOUR RESIDENCY AGREEMENT

The Community is a licensed personal care home which provides residence, care, and services to residents. You have engaged the Community to provide residence, care, and services, and your application has been accepted subject to the terms and conditions of this Agreement and its Exhibits. The purpose of this Agreement is to provide a statement of the residential accommodations and other services that will be provided to you at the Community. This Agreement and its Exhibits also set forth you, your Representative, and your Responsible Party's contractual obligations to the Community, both financial and non-financial.

**Important Notice: This Residency Agreement is a legally binding contract.** The Exhibits to this Residency Agreement are incorporated into and made part of this Residency Agreement as if set forth fully in the body of the contract. The capitalized terms in the Exhibits have the same meaning given to them in this Residency Agreement. By signing this Residency Agreement, the parties are expressly agreeing to the terms of this Residency Agreement and all of its Exhibits. The Community encourages you to read this Residency Agreement carefully, ask any questions that you have, and consult with your attorney before choosing to accept the terms and conditions of this contract.

This Community is operated on a non-discriminatory basis and affords equal treatment and access to services to eligible persons regardless of race, color, religion, creed, gender, national origin, or ancestry. This Community is not affiliated with any religious organization.

However, any Resident who requests admission to the Community must authorize, and will be subject to, a criminal background check, including a search of the National Sex Offender Registry.

## ARTICLE III
## CRITERIA FOR ADMISSION & CONTINUED RESIDENCY, ACCOMMODATIONS AND SERVICES

### A. Criteria for Admission and Continued Residency

**1.** **Criteria for Admission and Continued Residency.** Please see attached **Exhibit L** ("Criteria for Admission to and Continued Residency at a PCH") which sets forth the statutorily mandated criteria for admission and continued residency in a Personal Care Home. The Community is not required to admit or retain the Resident or to contract with the Resident for services, if the Community determines, in its sole discretion that it cannot meet the Resident's needs or the Resident fails to meet the requirements as set forth by law.

**2.** **Initial Health Assessment.** As part of the admission criteria, all prospective residents must undergo a face-to-face medical examination completed by a licensed physician, a licensed physician assistant, or a licensed nurse practitioner within 30 days before admission to the facility. The examination must be recorded on the Healthcare Facility Regulation Division, Physician's Medical Evaluation for Assisted Living form. The signed and completed medical examination report shall be submitted to the owner or administrator of the Community who shall use the information contained therein to assist in the determination of the appropriateness of the resident's admission and continued stay in the Community. The medical examination report shall become a permanent part of the record of the resident at the facility and shall be made available to the Georgia Department of Community Health during inspection or upon request.

If a medical examination has not been completed within 30 days before the admission of the resident to the Community because the applicant for admission is being evaluated for admission pursuant to an emergency placement made at the request of the Adult Protective Services Section of the Division of Aging Services, Department of Human Services, or another licensed facility that is requesting the placement pursuant to activation of its emergency preparedness plan for relocation of residents, a licensed physician, licensed physician assistant, or licensed nurse practitioner shall examine the resident and complete the Healthcare Facility Regulation Division, Physician's Medical Evaluation for Assisted Living form, within 14 days following the admission to the facility to enable the facility owner or administrator to determine the appropriateness of the admission. The medical examination form shall become a permanent part of the record

of the resident at the facility and shall be made available to the Agency for Health Care Administration during inspection by the agency or upon request.

**3.      Continued Residency Health Assessment.** As part of the continued residency criteria, a resident must have a face-to-face medical examination by a licensed physician, a licensed physician assistant, or a licensed nurse practitioner at least every 3 years after the initial assessment, or after a significant change, whichever comes first. The results of the examination must be recorded on the Healthcare Facility Regulation Division, Physician's Medical Evaluation for Assisted Living form. Ordinary day-to-day fluctuations in functioning and behavior, a short-term illness such as a cold, or the gradual deterioration in the ability to carry out the activities of daily living that accompanies the aging process are not considered significant changes.

**B.      Your Apartment.**

Your apartment (the "Apartment") is identified in **Exhibit A** ("Your Apartment, Fees, & Fee Schedules") of this Agreement. All persons residing in the Community are required to read and execute a Residency Agreement prior to taking residency in the Apartment. You may move into your Apartment as of the date (the "Occupancy Date") listed in **Exhibit A.** If you relocate to another apartment in the Community, **Exhibit A** will be updated to reflect your new Apartment and the applicable rates.

**1.      Shared Apartment.** If two persons, whether or not related, share an Apartment ("Shared Occupancy"), each person will sign a separate Residency Agreement. See **Article IV, Sections B and G** and **Article V, Section F** for more information about Shared Occupancy.

**2.      Apartment Maintenance and Alterations.** The Community will perform all necessary maintenance and repairs of the Apartment at its expense. However, you will be responsible for reimbursing the Community for any maintenance and/or repairs to the Apartment that are not attributable to normal wear and tear. You may not cause or permit any physical alterations, additions or changes to any part of your Apartment without first obtaining the written approval of the General Manager of the Community. All such alterations, additions or changes shall be at your expense and shall become the property of the Community.

**3.      Right of Entry.** You agree that the Community's employees or agents may enter your Apartment at any reasonable time in order to provide necessary services to you, to perform building inspection and maintenance functions, and otherwise to carry out the Community's obligations under this Residency Agreement. You agree to allow entry into your Apartment at any time to the Community's employees or agents when they are responding to the medical alert system, fire system, or other emergency.

**C.     Common Areas.**

As with all of the Community's residents, you will be entitled to the use of its common areas, including the main dining room, lounge areas, and recreation rooms. The Community may change or reconfigure common areas at its discretion.

**D.     Standard Services.**

The Community makes available the following Standard Services to all residents:

- 24-hour on-site Staff
- Meals/Snacks
- Housekeeping
- Laundry
- Utilities
- Transportation
- Planned Activities

**1.     Personal Assistance and Care.** The Community offers various Personal Assistance and Care Services ("Personal Care Services") to assist you with activities of daily living, such as dressing, grooming, bathing, eating, toileting, ambulation and transfer. The Community performs regular health assessments to determine your needs, as described below.

**2.     Internal Assessments.** Prior to or on the Occupancy Date, the Community will perform an initial assessment of your needs. This internal assessment is separate, apart and in addition to the Initial Health Assessment described above in Article III, (A)(2) above. This assessment will determine your Level of Care by identifying your need for Personal Care Services and will be used to develop a written Resident Service Plan for you. Thereafter, you will receive, at minimum, a re-assessment of your needs every six (6) months (or more frequently, if care needs change or required by law) to determine whether a change in your service level is necessary. Your Resident Service Plan will be revised and updated accordingly. The Community may also revise your Resident Service Plan if it determines that you have experienced a significant change in condition (i.e. there has been a significant change in your ability to perform various activities of daily living over the course of a week or more, or such other time period as defined by law). The Community's Staff will consult with you (and, at your written request, with your Responsible Party) concerning the results of all assessments and determinations of a change in condition.

**3.     Transfer to Community Providing Higher Level of Care.** If the assessment process reveals that you need care beyond what can be provided at the Community, you and your Responsible Party shall, upon written notification from the Community, make arrangements for transfer to an appropriate care setting. At your request, the Community shall work with you (and your family and, if circumstances

require, a social service agency) for appropriate placement. See **Article V** for more information about transfers.

E.     **Supplemental Services.**

Certain supplemental Personal Care Services are available to you at an additional charge. Please refer to **Exhibit B** ("Supplemental Service Fees") for a description of the various Supplemental Services offered, along with the associated fees involved with these services.

    **1.**     **Medication Management Program.** The Community makes available a program for assistance with the acquisition and administration of your medication ("Medication Management"). See **Exhibit C** ("Medication Management Program Agreement") for more information about medication services and requirements.

    **a.**     **Cost of Participation in the Program.** The cost of the Medication Management Program is $375.00. If you choose not to participate in the Medication Management Program, you will not receive a discount in your Monthly Fee.

    **b.**     **Cost of Medication.** You or your Responsible Party is responsible for paying for all of your medication whether or not you participate in the Medication Management Program.

    **c.**     **Medication Management Program.** The Community's Medication Management Program requires the use of a unit dose packaging system, which can be provided by a pharmacy which has contracted with the Community and agreed to comply with the Community's requirements when it sends medications to the Community. If you choose to participate in the Medication Management Program, you must purchase medications from the Community's preferred pharmacy provider, at your expense.

F.     **Proxy Caregivers.** "Proxy caregiver" means an unlicensed person who has been selected by a disabled individual or a person legally authorized to act on behalf of such individual to serve as such individual's proxy caregiver, to perform documented health maintenance activities. Health Maintenance Activities are limited to those activities that, but for a disability, a person could reasonably do for him or herself, may be provided by a Proxy Caregiver. A Proxy Caregiver is an unlicensed person chosen to act on behalf of a disabled individual. The Community does not provide Proxy Caregivers, but does allow residents to hire Proxy Caregivers independently, subject to the additional limitations herein.

Proxy Caregivers must receive training and demonstrate the necessary knowledge and skills to perform documented health maintenance activities, including specialized procedures for such individual. Proxy Caregivers must also be familiar with the

Community emergency evacuation routes and have documentation reflecting compliance with the provisions of the Rules for Proxy Caregivers, § 111-8-100 et seq.

You and the Proxy Caregiver will be required to follow any applicable laws and the Community's policies concerning Private Duty Helpers and Proxy Caregivers. See **Exhibit E** ("Rules and Procedures for Private Duty Personnel and Proxy Caregivers"). Additionally, all Proxy Caregivers must review, agree, and sign **Exhibit E.**

Proxy Caregivers shall also be required to follow the additional rules for Proxy Caregivers at **Exhibit N.**

**G.    Private Duty Helper.** If you believe you need more assistance than what you have contracted the Community to provide, you may employ private duty helpers, (e.g., private aides, nurses, companions, sitters etc.), at your expense, only with the prior notice to the Community. You may request these services to be arranged by the Community for an additional fee. Any Private Duty Helper engaged by you will not become or be considered the Community's employee or agent. You and the Private Duty Helper will be required to follow any applicable laws and the Community's policies concerning Private Duty Helpers. See **Exhibit E** ("Rules and Procedures for Private Duty Personnel and Proxy Caregivers"). The Private Duty Helper may be removed or excluded from the Community for violation of such laws or policies. If the Private Duty Helper does not have proof of liability insurance or proof of Worker's Compensation insurance, then the Resident or the Responsible Party will be required to maintain adequate liability insurance to cover the Private Duty Helper, and may be required to provide a current Certificate of Insurance to the Community. All Private Duty Helpers must review, agree, and sign **Exhibit E.**

**ARTICLE IV**
**FINANCIAL ARRANGEMENTS**

**A.    Community Admission Fee.** Prior to or on the Occupancy Date, you agree to pay a Community Admission Fee equal to the amount shown in **Exhibit A** ("Your Apartment, Fees & Fee Schedules"). The Community Admission Fee is NON-REFUNDABLE, except as follows: If the Residency Agreement is terminated within thirty (30) days of the Occupancy Date, for reasons other than the death of the Resident, then the Community Admission Fee will be refunded, less the costs of repairs or replacements required in connection with any damage beyond normal wear and tear to your Apartment, which the Community determines to be your responsibility. The purpose of the Community Admission Fee is to cover the one-time expense of establishing you as a new resident in our Community and to cover capital expenditures of the Community.

**B.    Monthly Fees.**

    **a.    Primary Monthly Fee.** You agree to pay a Primary Monthly Fee, which covers the residency and accommodations for your Apartment and the Standard Services outlined in **Article III, Section**

**D.** The Primary Monthly Fee is set forth in **Exhibit A** of this Residency Agreement.

**b.**      **Shared Occupancy Rate.** If the Resident shares an Apartment, the Shared Occupancy Rate specified in **Exhibit** A applies. By signing this Agreement at the Shared Occupancy Rate you consent to sharing your Apartment. If a married couple is sharing an Apartment, Resident is hereby agreeing to be jointly and severally responsible for all fees due under this Agreement and under the Residency Agreement of his or her spouse, just as if Resident were a signatory to such other Agreement.

**C.**      **Supplemental Services Fees.** If you receive any of the supplemental services listed in **Exhibit B** ("Supplemental Service Fees"), then you agree to pay the applicable fees as set forth in the Exhibit. If the Community provides a supplemental service which is not listed in **Exhibit B,** you agree to pay the established charge for the service.

**D.**      **Payment Schedule and Monthly Invoice.** Prior to or on the Occupancy Date, you agree to pay the Community an amount equal to the Total Monthly Fee set forth in **Exhibit** A. This payment will be applied to your first month's residence. If the Occupancy Date is on any day other than the first day of the month, the advance payment will be prorated accordingly and the residual amount will be credited to the following month's Total Monthly Fee. Thereafter, an itemized statement will be sent to you each month. Fees shall be due and payable by the first (1st) day of each month.

**E.**      **Late Payment Charge.** If your account is not paid in full by the third (3rd) day of the month in which it is due, a late payment charge will be assessed on the outstanding balance equal to ten percent of the total outstanding balance, per month, until paid. In the event of failure or refusal to pay the amount charged under the terms of the Residency Agreement and the subsequent referral of the account to an attorney or collection agency, you agree to pay, without limitation, all charges, expenses, and attorney's fees attributable to collection.

**F.**      **Rate Changes.** The Community may adjust the Supplemental Service Fees set forth in **Exhibit B,** after providing you with thirty (30) days advance written notice. The Primary Monthly Fees set forth in **Exhibit A** will not be changed more than once in any calendar year, and will only be changed upon written notice at least sixty (60) days prior to the increase. The monthly statement following the date when the change occurs will reflect the adjustment in Total Monthly Fees, as well as a prorated charge from the day the change occurred to your service during the preceding month.

**G.**      **Fees in the Event of an Apartment Hold.** If you are away from your Apartment (including but not limited to transfer to a hospital, hospice or other medical facility), your Apartment will be held for your return, as described below in **Article V, Section E.** Your payment obligations for the days when you are absent will be as follows:

1.      If you are a Single Occupancy Resident and you seek an Apartment Hold, you will be responsible for payment of the Primary Monthly Fee as set forth in **Exhibit A** during your absence.

2.      If you are a Shared Occupancy Resident, and one person is temporarily transferred to another Community (including transfer to another section of the Community), your Primary Monthly Fee will not change.

**H.      Special Assessments.** The Community reserves the right to assess charges for special circumstances outside the Community's control, such as sharp increases in utility costs or other necessary expenses. The Community shall provide you at least sixty (60) days written notice (or such additional days' notice as may be required by law) prior to the imposition of such special assessments.

**I.      Refunds.** The following Refund Policy shall apply:

1.      You shall receive a refund of any payments to which you are entitled within thirty (30) days of termination of this Residency Agreement.

2.      In the event of your death, the Community shall return all refunds to the Executor or Administrator of your Estate, if one has been appointed at the time of disbursement of such funds and, if not, to the individual(s) named in **Exhibit J** ("Beneficiary Designation Form"). If such individuals cannot be located, funds will be disbursed as allowed under the law.

3.      The Community may deduct from your refund costs associated with repairs or replacements required in connection with any change, beyond normal wear and tear, which the Community determines to be your responsibility. The Community shall provide you or your estate with written notice of any claim against your refund (including repair or replacements costs) and allow fourteen (14) days for you or your estate to respond prior to deducting such amount(s).

4.      If the Community discontinues operations, any advance payments for services not received shall be refunded to you within 10 business days of closure, whether or not such refund is requested.

**ARTICLE V**
**TERM, TRANSFER AND TERMINATION**

**A.      Term.** This Residency Agreement becomes effective as of the Occupancy Date and shall be automatically renewed on a month-to-month basis, unless: (i) the Community gives you forty-five (45) days prior written notice of its intent not to renew the Residency Agreement, or (ii) the Residency Agreement is terminated as provided below.

**B.      Termination by Resident.** You may terminate this Residency Agreement upon thirty (30) days prior written notice delivered to the Community. If you fail to provide

thirty (30) days prior written notice to the Community, you will be responsible for paying the prorated monthly rate for the difference between the termination date and the full 30-day notice period. For example, if the Community received notice from you on the 24th day of the month that you intend to terminate the Residency Agreement on the 31st day of the month (i.e. you provide only 7 days' notice of termination), you will be responsible for the prorated monthly charges for an additional 23 days.

**C.    Termination by the Community.** The Community may terminate this Residency Agreement:

**1.    Without Advance Notice.** As permitted by the Georgia Rules and Regulations, nothing in the above section prevents the immediate discharge from the premises, with or without notice, of a resident who is combative, violent, suicidal or homicidal, otherwise a danger to himself or others, or who, due to changes in your physical or mental condition, supplies, services, or procedures are required which extend beyond the certification, licensure, design, or staffing of the Community. You, your Representative, and your Responsible Party agree to notify the Community in writing immediately upon obtaining knowledge that the Resident has experienced any one of these conditions or behaviors.

This Agreement shall also be terminated without advance notice if you permanently transfer to another community or home.

**2.    Reasons for Termination Upon Thirty (30) days Notice.** The Community may terminate this Residency Agreement upon thirty (30) days written notice written notice delivered to you and, if applicable, your Representative and Responsible Party, at the address(es) provided for the following reasons:

**a.  Resident's Welfare.** Termination is necessary to protect your safety, health, or welfare.

**b.  Welfare of Others.** Your continued residence in the Community endangers the safety, health, or welfare of others.

**d.  Failure to Abide by the Rules.** You fail to observe and abide by the Community's rules and policies.

**e.  Contract Violation.** You fail to meet your contractual obligations under this Residency Agreement.

**f.    Interference with Quiet Enjoyment of Others.** Your conduct is disruptive or disturbing to other residents and such behavior continues after notice to you to cease such behavior.

**g.  Cease of Operations.** The Community ceases to operate or is sold to a new operator.

**h.  Failure to Pay Amounts Owed.** You fail to pay charges owed to the Community as set forth in **Article IV** above.

**D.     Removal of Personal Property.** Upon termination of this Residency Agreement (for whatever reason, including death or discharge), your personal property must be removed from your Apartment. The Community shall continue to assess and you will be required to pay, the Primary Monthly Fee on a prorated basis until the personal property is removed from the Apartment. If your personal property is not removed within thirty (30) days of termination of this Agreement, the Community shall have the option to continue to charge the Primary Monthly Fee on a prorated basis or to remove the personal property from your Apartment and place it in storage at your expense, at a rate equal to the actual cost (not to exceed twenty percent of your Monthly Fee), provided that the Community gives you or your Responsible Party fourteen (14) days written notice of such removal. If the belongings remain unclaimed for forty-five (45) days after the notification was provided, the Community may dispose of them at the expense of the Resident or Responsible Party, unless other arrangements have been made with the Community and approved by the General Manager.

**E.     Apartment Hold.** If you are away from your Apartment (including but not limited to transfer to a hospital, hospice or other medical facility), your Apartment will continue to be held for your return until the Community receives written notification that you will not return to the Apartment. Your payment obligations are described in **Article IV, Section F above.**

   **1. Terminating an Apartment Hold Agreement.** The Resident or the Responsible Party shall notify the Community in writing of any change in status that would prevent the Resident from returning to the Community. Until such written notice is received, the agreed upon Primary Monthly Fee may be charged by the Community, unless the Resident's medical condition, such as the Resident being comatose, prevents the Resident from giving written notification and the Resident does not have a Responsible Party to act on the Resident's behalf.

**F.     Change in Occupancy Status.** In the event of death or permanent transfer of a Shared Occupancy Resident, the remaining Resident shall have the option of:

   1.     Remaining in the Apartment with no roommate. The Primary Monthly Fee will be changed to reflect the Single Occupancy Rate for the Apartment.

   2.     Remaining in the Apartment with consent to share the Apartment with a roommate. The Primary Monthly Fee will not be changed and you will continue to assume responsibility for the Shared Occupancy Rate.

   3.     Relocating to a different Apartment, when such an Apartment becomes available. Relocating to a different Apartment requires you to execute a new Residency Agreement.

**ARTICLE VI**
**ADDITIONAL PROVISIONS APPLICABLE TO THE MEMORY CARE UNIT**

In additional to the general provisions herein, the following additional provisions apply to Residents admitted into the Memory Care Unit of the Community.

**A.**      **Memory care unit.** The Memory Care Unit is that unit in the Community for Residents who require additional or specialized care related to diagnoses of probable Alzheimer's Disease or other dementia who may be at risk of engaging in unsafe wandering activities outside the unit or the Community (eloping).

**B.**      **Admission Procedures and Screening Criteria.** Resident's must have a physician's report of physical examination completed within 30 days prior to admission to the Community or unit on forms made available by Department. The physical examination must clearly reflect that the resident has a diagnosis of probable Alzheimer's Disease or other dementia and has symptoms which demonstrate a need for placement in the specialized unit. In addition, the physical examination report must establish that the potential resident of the unit does not require 24-hour skilled nursing care.

**C.**      **Procedures for Emergency Situations** The community will implement the DCH approved Emergency Plan in accordance with applicable regulations, as necessary.

**ARTICLE VII**
**GENERAL PROVISIONS**

**A.**      **Role of Your Doctor.** You and your Responsible Party understand that only your Doctor can do the following: (1) prescribe any medications or treatments for you; (2) diagnose any medical condition that you may have; (3) order any lab work, x-rays, therapy or limitations on your activities that the Doctor deems appropriate, and; (4) determine if any follow-up action is necessary based on the results of your lab work, x-rays, therapy, etc. The Community's Staff cannot prescribe medications, make a medical diagnosis, or order lab work, x-rays, physical, speech or occupational therapy, etc.

**B.**      **Your Health Records.**

        **1.**      **Confidentiality.** All of your health care records shall remain confidential. Copies of your health care records will be released only with your express HIPAA compliant written authorization or that of your Representative except where expressly required or allowed by law. You shall be responsible for the cost of copying records requested by you or your Representative. All health records are the property of the Community.
        **2.**      **Authorization to Release Information.** The Community is hereby authorized and directed to release information and health records concerning you to other medical and health care providers, insurance companies, federal and/or state agencies and regulatory bodies to the extent necessary to obtain payment, coordinate and/or facilitate your care, and otherwise comply with applicable laws and regulations. You

further authorize the release of information and/or records necessary for the Community to conduct reviews or audits of care.

**C.    Emergency Services.** You authorize the Community to obtain emergency health care services and/or supplies (including ambulance transportation and pharmaceutical) at your expense, whenever, in the Community's discretion, such services and/or supplies are deemed necessary. In an emergency, the Community may transfer you immediately to a hospital or other community which it deems more appropriate for the type of care required. The Community's Staff may consult with your doctor regarding whether emergency services are needed, and you agree to hold harmless the Community for reliance upon your doctor's advice in this regard. If you are under Hospice care, palliative care or comfort measures only, the Community will take this status into consideration in deciding whether emergency services are needed.

**D.    No One-On-One Care.** You understand that the Community will not be providing you with one-on-one Staff assistance. Rather, at limited time periods during the day, you will receive supervision or assistance from the Staff as determined by your Level of Care defined in this Residency Agreement. There will be times that you will be in your Apartment, hallway or common areas of the Community, including outdoors, without a Staff member present to supervise, observe or assist you. This is all part of the Community's goal of allowing you to live as independently as possible, with as much personal privacy, dignity, and personal decision-making as possible, in the least restrictive environment.

      **1.    Staff Response Time.** You and your Responsible Party also fully understand and appreciate the fact that, because you will not be receiving one-on-one Staff supervision or assistance, your requests for non-emergency Staff assistance will often not be responded to immediately. In fact, you and your Responsible Party understand that a non-emergency request, for example, a request to be assisted with changing into your nightgown, assisted with a shower or bath, assisted to the bathroom, etc., may take approximately 10-15 minutes to be responded to. If you desire a quicker response time, you and your Responsible Party understand that you will need to hire a Private Duty Helper (see **Article III, Section G** above). If you desire a quicker response time and you are not willing to pay for a Private Duty Helper, then you may have to reconsider if the Community is an appropriate care setting for you, and you may need to look at alternative options.

      **2.    Independence.** You and your Responsible Party understand that because you will be given as much independence, privacy, and personal decision-making as possible, there may be times when you are injured trying to independently perform your activities of daily living such as walking, getting dressed, bathing, transferring from your bed to bathroom, chair to bed, etc. You and your Responsible Party hereby agree that injuries, including those from falls, which occur while you are performing an activity that your physician has designated as an activity that you can perform independently, cannot reasonably be prevented.

**3.    Activities Done Without Supervision/Assistance.** You and your Responsible Party also agree that for any activity designated by your doctor as requiring supervision or assistance, which you decide to perform without reasonably requesting or waiting for Staff supervision or assistance, and which thereby results in an injury to you, is not the fault of the Community.

**4.    Unavoidable Injuries.** You and your Responsible Party agree that the Community cannot reasonably prevent the following events that may occur and result in injury to you:

**a.**    You may choose not to request Staff supervision or assistance before attempting to perform an activity of daily living such as walking, dressing, transferring, bathing, etc.

**b.**    You may forget to request Staff supervision or assistance before attempting to perform an activity of daily living such as walking, dressing, transferring, bathing, etc.

**c.**    You may request Staff supervision or assistance but then decide to perform an activity of daily living before the Staff member has been able to reasonably respond to your request.

**d.**    You may refuse to comply with the Staff's recommendation to use a cane, walker, wheelchair, or other safety precautions.

**e.**    You may choose to exercise your right to refuse medications or refuse to follow your doctor's advice.

**f.**    You may exercise your right to refuse therapy.

**g.**    You may exercise your right to refuse to have a private duty helper.

**h.**    You may choose to make use of a personal motorized wheelchair or scooter.
**i.**    You may refuse to follow the recommendations listed on your Resident Service Plan.

**5.    Falls.** As we get older, generally we begin to experience an increase in falls, often due to our decreased eyesight, weaker muscles, slower response time, shuffling gait and/or side effects of our medications. You and your Responsible Party understand that the Community cannot guarantee that you will not experience a fall, or an injury from a fall, at the Community.

**6.    Injury Caused by Other Residents.** You and your Responsible Party fully understand that the Community is comprised of residents with memory disorders and/or

physical limitations. Because of the nature of these disorders and limitations, there may be an unforeseeable and/or unavoidable injury to you caused by another resident, and you agree not to hold the Community liable for any such injury. For example, another resident may fall, and in the act of falling, that resident may cause an injury to you (i.e., the resident may fall and bump you causing you to have a skin tear or causing you to lose your balance and thereby causing you to fall too. Or, another resident may unintentionally bump you with his or her cane, causing you to have a bump, or skin tear, or possibly even causing you to fall, etc.). In sum, you agree that the Community simply cannot guarantee, given the resident population, that you will not be injured by the acts of another resident.

       **7.**    **Outdoor Hazards.** The Community provides a scenic setting to enhance your enjoyment and quality of life. This setting includes plantings and irregular terrain which may cause a risk to you or your guests. You and your Responsible Party understand that the Community cannot guarantee that you and your guests will not experience a fall in an outdoor setting or an injury from being outdoors, at the Community. By the use of enjoyment of the outdoor setting, you assume these inherent risks and you agree to indemnify the Community and hold the Community harmless from and against any and all damages, liability and injury arising from your use of the outdoor setting at the Community with the exception of such damages, liability and injury resulting from the Community's willful misconduct or gross negligence.

**E.**    **Resident Handbook.** You agree to comply with the rules listed in the Resident Handbook for operation and maintenance of the Community. The Resident Handbook will be provided to you in writing, and can be obtained from the Community upon request. The Community may revise the Resident Handbook from time to time, in its discretion. The Community will provide written notice to you if it determines that you are not complying with the rules listed in the Resident Handbook.

**F.**    **Firearms.** Firearms or other weapons are not permitted on Community property, including those used as decor or display only.

**G.**    **Smoking Policy.** See **Exhibit F.**

**H.**    **Motorized Vehicle Policy and Waiver.** See **Exhibit G.**

**I.**    **Photography/Marketing Material.** See **Exhibit H.**

**J.**    **Resident Rights.** See **Exhibit K.**

**K.**    **Criteria for Admission to Personal Care Home.** See **Exhibit L.**

**L.**    **Do Not Resuscitate Order & Advanced Directives.** See **Exhibit M.**

**M.**    **Grievance Procedure.** The Community's Grievance Procedure is set forth in the Community Guidelines. See **Exhibit O.**

**N.** <u>**Waiver of One Breach not a Waiver of any Other.**</u> The failure of the Community in one or more instances to insist upon the strict performance, observance, or compliance by the resident with any of the terms and provisions of this Residency Agreement, shall not be construed to be a waiver or relinquishment by the Community of its right to insist upon strict compliance by the Resident with all of the terms and provisions of this Residency Agreement.

**O.** <u>**Release from Responsibility.**</u> You hereby agree to release the Community and its officers, employees, and agents from responsibility for your condition while you are away from the Community for any reason, as fully described in **Exhibit I** ("Community Outing Liability Release").

**P.** <u>**Liability for Damage.**</u> You agree to maintain your Apartment in a clean, sanitary and orderly condition. You will reimburse the Community for the repair or replacement of furnishings and fixtures (including carpeting) in your Apartment damaged beyond normal wear and tear. In addition, you shall reimburse the Community for any loss or damage to its real or personal property (whether located within your Apartment or not) caused either intentionally or negligently by you, your guests, or invitees.

**Q.** <u>**Insurance and Responsibility of Your Property.**</u> You are responsible for securing adequate personal property and liability insurance for you, your property, and your guests. The Community encourages, but does not require, you to purchase Renter's Insurance and other coverage adequate to protect your personal property, such as Flood Insurance if the Community is located in a flood zone (please consult the Community's General Manager to determine whether the Community is in a flood zone). The Community shall not be responsible for, and its insurance will not protect you against, personal liability for injury to guests or other persons in your Apartment or any loss or damage to your personal property (including, for example, eyeglasses, dentures, hearing aids, clothing, jewelry and other personal items) unless such loss is caused by the negligent acts of the Community.

**R.** <u>**Entities/individuals Bound.**</u> All of the terms of this Agreement and its Exhibits shall be binding upon and come to the direct benefit of and be enforceable by and against the Community and its successors and assigns and you and your heirs, personal representatives, children, spouses, legal guardians, agents, and attorneys in fact.

**S.** <u>**Third-Party Beneficiaries.**</u> It is the intention of the parties that this Residency Agreement and its Exhibits are for the direct benefit of the Resident, and that the Resident's spouse and children, if any, or next of kin are also directly benefited by the Resident's admission into this Community.

**T.** <u>**Obligatory Information.**</u> You have an ongoing obligation to provide the Community with accurate, complete, and current information about your health care status and needs.

**U.** <u>**No Requirement to Perform Services.**</u> The Resident may not be required to perform services for the Community.

**V.**    **Reliance.** By entering into this Agreement, the Community is relying upon the truthfulness of the information, promises, and representations made by you, your Representative, and your Responsible Party.

**W.**    **Governing Law.** This Agreement shall generally be governed by applicable Georgia law. You and the Community also expressly agree that this Agreement and your stay at the Community substantially involve interstate commerce.

**X.**    **Severability.** Any clause, term, phrase, provision or part thereof contained in this Agreement or its Exhibits is severable, and in the event any of them shall be found to be invalid for any reason, this Agreement and its Exhibits shall be interpreted as if such invalid clause, term, phrase, provision or part thereof were not contained herein, and the remaining clauses, terms, phrases, provisions or parts thereof, of this Agreement and its Exhibits shall not be affected by such determination and shall remain in full force and effect. This Agreement and its Exhibits shall not fail because any clause, term, phrase, provision, or part thereof shall be found indefinite or invalid. No part of this Agreement or its Exhibits will be construed against any party because that party wrote the Agreement and Exhibits.

**Y.**    **Entire Agreement.** This Agreement and any written amendments constitute the entire agreement between the parties and supersede all prior and contemporaneous discussions, representations, correspondence, and agreements whether oral or written. This Agreement may only be modified in writing signed by all parties. If you have been promised some level of care or service that is not included in this Agreement, please write that promise out in detail in the space provided:

_____

_____

_____

_____

_____

**Z.**    **Consent to Release.** By executing this Agreement, the Resident authorizes and consents to the release of the Resident's information to the home as needed.

This amendment must be signed by the Resident/Resident's Representative and the General Manager in order to be effective.

_____          _____

(Resident/Resident's Representative)          (General Manager)

**[THIS SPACE INTENTIONALLY LEFT BLANK]**

**BY SIGNING BELOW WHERE INDICATED, YOU, YOUR REPRESENTATIVE, YOUR RESPONSIBLE PARTY, AND THE COMMUNITY HEREBY ACKNOWLEDGE THAT EACH PARTY HAS READ AND FULLY UNDERSTANDS THE PROVISIONS OF THIS RESIDENCY AGREEMENT, AND EACH PARTY KNOWINGLY AND VOLUNTARILY ACCEPTS OF ALL THE TERMS AND CONDITIONS OF THIS RESIDENCY AGREEMENT. THE UNDERSIGNED EACH FURTHER CERTIFIES THAT HE/SHE HAS RECEIVED A COPY OF THIS RESIDENCY AGREEMENT AND ITS EXHIBITS.**

**RESIDENT/RESIDENT'S REPRESENTATIVE**                    **RESPONSIBLE PARTY**

_____          _____
Date                                                      Date

_____          _____
Printed Name                                              Printed Name

_____          _____
Signature of Resident/Resident's                          Signature of Responsible Party in his/her
Representative*                                            Individual Capacity

*Resident's Representative <u>understands</u> and agrees that by signing this Residency Agreement he/she is signing in both a <u>representative and individual capacity.</u>

**COMMUNITY REPRESENTATIVE:**

_____          _____
Printed Name                                                     Date

_____
Signature of Community Representative**

** The Community Representative/employee is authorized to sign this Residency Agreement on behalf of the Community as defined above on page 1 of this Residency Agreement.

**EXHIBIT A**
**YOUR APARTMENT, FEES & FEE SCHEDULE**

**as of _____/_____/_____**

| Resident: | Move In Date: |
|---|---|
| _____ | _____ |

| Apartment No: |
|---|
| _____ |

| One-Time Fees | |
|---|---|
| Community Admission Fee | $_____ |
| Total One-Time Fees | $_____ |

| Monthly Fees | |
|---|---|
| Primary Monthly Fee: | $_____ |
| Additional Fee for Memory Care Unit: | |
| Total Monthly Fee* | $_____ |

*Additional fees may apply for any supplemental services/amenities received.  Supplemental Fees are listed in Exhibit B.

| Current Rate for Your Apartment | |
|---|---|
| Single Occupancy | $_____ |
| Shared Occupancy (per Resident) | $_____ |

## ACKNOWLEDGEMENT OF RECEIPT OF EXHIBIT A
## YOUR APARTMENT, FEES & FEE SCHEDULES

**RESIDENT/**
**RESIDENT'S REPRESENTATIVE:**                    **RESPONSIBLE PARTY:**

_____        _____
Date                                     Date


_____        _____
Printed Name                             Printed Name

_____        _____
Signature of Resident/Resident's         Signature of Responsible Party in his/her
Representative*                          Individual capacity

*Resident's Representative understands
and agrees that by signing this Agreement
or Exhibit he/she is signing in both a
representative and individual capacity.

COMMUNITY REPRESENTATIVE:


_____        _____
Signature of Community Representative**       Date

**This individual is authorized to sign this Agreement and/or Exhibit on behalf of the Community as defined on page 1 of the Residency Agreement.

**EXHIBIT B**
**SUPPLEMENTAL SERVICE FEES**

| Community Programing Outings | Varies by Outing | |
|---|---|---|
| Room Service | $ 6.00 | Per service |
| Guest meals: | $ 5.00 | Breakfast |
| | $ 8.00 | Lunch |
| | $ 8.00 | Dinner |
| Copying | $ 1.00<br>$ 2.00<br>$ 3.00 | Up to 10 Pages<br>10-25 Pages 25-<br>50 Pages Max |
| Unscheduled transportation | $ 15.00 per trip | Up to 15 miles |
| | $ 30.00 per trip | 15 — 30 miles max |
| Catering service/party planning | Varies by menu | |
| Barber & beauty services | See Separate Schedule | |
| | $ | |
| Personal Service Fees | | |
| | | |

**[THIS SPACE INTENTIONALLY LEFT BLANK]**

## <u>ACKNOWLEDGEMENT OF RECEIPT OF EXHIBIT B</u>
## <u>SUPPLEMENTAL SERVICE FEES</u>

**RESIDENT/**
**RESIDENTS REPRESENTATIVE:**              **RESPONSIBLE PARTY:**

_____              _____
Date                                          Date


_____              _____
Printed Name                                  Printed Name


_____              _____
Signature of Resident/Resident's              Signature of Responsible Party in his/her
Representative*                               Individual capacity

*Resident's Representative <u>understands</u>
and <u>agrees</u> that by signing this Agreement
or Exhibit he/she is signing in both a
<u>representative and individual capacity.</u>

**COMMUNITY REPRESENTATIVE:**

_____              _____
Signature of Community                        Date
Representative**

  **This individual is authorized to sign this Agreement and/or Exhibit on behalf of the Community
  as defined on page 1 of the Residency Agreement.

**EXHIBIT C**
**<u>MEDICATION MANAGEMENT PROGRAM AGREEMENT</u>**

The Community makes available a program for assistance with your medication
("Medication Management Program")

**A. <u>Participation in the Medication Management Program</u>**

    **1. Preferred Pharmacy Providers.** The Community works closely with pharmacy providers to make certain that the needs of our residents are met. Preferred pharmacy providers are chosen based upon their ability to provide services to our residents to enhance their health and wellness. Important services include:

        a.    Screening for possible negative drug interactions;

        b.    Assessments for potential allergic reactions of medications;

        c.    Recommending therapeutic substitutions when appropriate;

        d.    Providing competitive pricing for comparable packaging and offering generic substitutions when appropriate;

        e    Alerting staff and physicians when there is a duplication of prescriptions;

        f.    Individual wellness recommendations;

        g.    Regular scheduled review and monitoring of medications;

        h.    Routine or emergency delivery 24 hours a day, 365 days a year; and

        i.    Unit dose packaging system that meets the Community's standards for safety.

    The Community's "preferred provider" is Gayco Healthcare.

    **2. Mandatory Use of Preferred Provider.** If you choose to participate in the Medication Management Program and pay the Medication Management Fee, you must use the Community's preferred provider listed above.

**B. <u>Declining to Participate in the Medication Management Program</u>**

    1. If you have chosen **NOT** to participate in the Medication Management Program, you understand and agree that:

        a.    You will store your medications in a locked cabinet in your Apartment at all times;

b.      Prior to or on the Occupancy Date, you will provide the wellness director with a copy of the doctors' orders for your current medications along with a current list of those medications. Thereafter, to the extent there are any changes in the orders for your medications (change in dose or timing of administration for a medication, discontinuance of a medication, or an addition of a new medication, etc.), you will promptly provide the wellness director with the corresponding doctors' orders along with an updated list of medications. You agree to keep this medication list up to date at all times;

c.      You are responsible for all of your medication administration needs, including, but not limited to the following:

(i)      delivering your doctor's orders for medication to your pharmacy

(ii)     picking up your medication from the pharmacy;

(iii)    taking your medication as ordered, and;

(iv)    timely re-filling your medication.

d.      You will have responsibility for reordering medications from the pharmacy, but in the event the medications are not delivered **within two (2) days prior to the depletion** of your medication stock, the Community staff will reorder your medications with the "preferred provider" to ensure no disruption takes place;

e.      You will be responsible paying for the medications and any associated service charges;

f.      If you independently administer your own medication, but prefer the Community to store your medications, then you will be enrolled in the Medication Management Program; and

g.      If at any time you are no longer willing or able to adhere to this system, you will be asked to participate in the Medication Management Program. If you do not wish to participate in the Medication Management Program, you understand you will need to find alternative housing.

| Medication Management Program |
| --- |

I AGREE to participate in the Program.

I DECLINE to participate in the Program.

**[SIGNATURES REQUIRED ON NEXT PAGE]**

## ACKNOWLEDGEMENT OF RECEIPT OF EXHIBIT C MEDICATION MANAGEMENT PROGRAM AGREEMENT

**RESIDENT/RESIDENT'S REPRESENTATIVE**

**RESPONSIBLE PARTY**

_____
Date

_____
Date

_____
Printed Name

_____
Printed Name

_____
Signature of Resident/Resident's Representative*

_____
Signature of Responsible Party in his/her Individual Capacity

*Resident's Representative <u>understands</u> and agrees that by signing this Residency Agreement he/she is signing in both a <u>representative and individual capacity.</u>

**COMMUNITY REPRESENTATIVE:**

Printed Name

Date

_____

_____

Signature of Community Representative**

_____
**This individual is authorized to sign this Agreement and/or Exhibit on behalf of the Community as defined on page 1 of the Residency Agreement.

**EXHIBIT D**
**RESPONSIBLE PARTY AGREEMENT**

The Community and

(i)      Resident, _____

(ii)     Resident's Representative, _____

(iii)    Responsible Party, _____

**Hereby agree as follows:**

A.  The Resident desires to live in the Apartment identified in **Exhibit A** to the Residency Agreement; and

B.  The Community is willing to enter into the Residency Agreement if Resident identifies an individual to serve as Responsible Party who is willing to provide certain assistance (as outlined below) to or on behalf of Resident in the event that such assistance is necessary, and who is willing to pay Resident's financial obligations, using Responsible Party's own finances and assets, to the Community under the Residency Agreement, in the event that Resident does not make payments when due (if allowed by law); and

C.  The Responsible Party agrees to provide such assistance and to pay such obligations, if and as necessary.

**IN CONSIDERATION** of the foregoing, the Parties agree as follows:

   1. **Personal Assistance.** In the event the Resident's condition requires the below listed assistance, and upon the request of the Community, Responsible Party will assist Resident or Resident's Representative, as necessary by:

   a.  Participating with the Community's staff in evaluating Resident's needs and in planning care.

   b.  Maintaining Resident's welfare and fulfilling Resident's obligations under the Residency Agreement.

   c.  Relocating Resident following termination of the Residency Agreement.

   d.  Transferring Resident to a hospital, nursing home, or other Community in the event that Resident requires care that the Community does not offer.

   e.  Removing Resident's personal property from Apartment when Resident leaves.

f. Making necessary arrangements for funeral services and burial in the event of death.

2. <u>Transfer Resident to New Setting.</u> Upon determination by the General Manager or health care provider that the Resident needs services beyond those the Community is licensed to provide, the Resident or Responsible Party shall be notified in writing that the Resident or Responsible Party must make arrangements for transfer to a care setting that has services needed by the Resident.

3. <u>Financial Responsibility.</u> If Resident fails to make payments to the Community under the Residency Agreement, Responsible Party agrees to pay the Community, using Responsible Party's own finances and assets if necessary, such payments and cost of pursuing payment within thirty (30) days of receiving written notice of non-payment. The Responsible Party's financial obligations to the Community shall not expire upon death or incapacity of the Resident.

4. <u>Review of Residency Agreement.</u> Responsible Party acknowledges that he/she has received and reviewed a copy of the Residency Agreement and its Exhibits. Further, Responsible Party acknowledges that he/she understands the terms of the Residency Agreement and its Exhibits and has had an opportunity to ask any questions he/she may have and an opportunity to consult with an attorney regarding the terms of the Residency Agreement and its Exhibits prior to signing the Residency Agreement and its Exhibits.

**SEND NOTICES TO RESPONSIBLE PARTY AT:**

Address

_____

_____

Phone No.

_____

**(THIS SPACE INTENTIONALLY LEFT BLANK]**

## ACKNOWLEDGEMENT OF RECEIPT OF EXHIBIT D
## RESPONSIBLE PARTY AGREEMENT

**BY THEIR SIGNATURES,** the Resident or Resident's Representative, the Responsible Party, and the Community ("Parties") have executed this Responsible Party Agreement to be effective this _____ day of _____ , 20\_\_\_\_\_ and acknowledge that they each have read, understand, and agree to be bound by all of the terms and conditions of the Residency Agreement, including any terms and conditions contained in this Responsible Party Agreement, including any terms and conditions contained in this Responsible Party Agreement and any other Exhibits and Addendums to the Residency Agreement.

**RESIDENT/RESIDENT'S
REPRESENTATIVE**

**RESPONSIBLE PARTY**

_____
Date

_____
Date

_____
Printed Name

_____
Printed Name

_____
Signature of Resident/Resident's
Representative*

_____
Signature of Responsible Party in his/her
Individual Capacity

*Resident's Representative <u>understands</u> and agrees that by signing this Residency Agreement he/she is signing in both a <u>representative and individual capacity.</u>

**COMMUNITY REPRESENTATIVE:**
Printed Name

Date

_____

_____

_____
Signature of Community Representative**

**This individual is authorized to sign this Agreement and/or Exhibit on behalf of the Community as defined on page 1 of the Residency Agreement.

**EXHIBIT E**
**RULES AND PROCEDURES FOR PRIVATE DUTY PERSONNEL**
**AND PROXY CAREGIVERS**

Private Duty Personnel ("PDP") includes helpers, private aides, sitters, companions, etc. Proxy Caregivers are those unlicensed persons hired by the Resident to perform Health Maintenance Activities on behalf of the Resident. All PDP and Proxy Caregivers must comply with all the laws and regulations of the state of Georgia, including, but not limited to, those concerning Personal Care Homes. All PDP must comply with the rules of the Community while providing services to residents at the Community. Failure to comply may result in PDP being expelled from the Community premises.

**A. General Requirements for PDPs and Proxy Caregivers (together "Aides")**

1. All Aides must meet the same basic test criteria that are required for employment of Community staff. If the Aides is employed by the Resident, his/her family, or the Responsible Party, the Community can perform the tests below at the Resident, family, or Responsible Party's expense.

   a.  Evidence of a TB Skin Test and written assurances that the Aides is free of signs and symptoms of infectious skin lesions and diseases that are capable of transmission to residents through normal staff- resident contact must be provided to the Community.
   b.  A background investigation.
   c.  A check of the Nurse Aide Registry.
   d.  A drug test with a negative result.

2. If the Aides does not have proof of liability insurance or proof of Worker's Compensation insurance, then the Resident or the Responsible Party will be required to maintain adequate liability insurance to cover the Aides, and may be required to provide a current Certificate of Insurance to the Community.

3. If there are unacceptable responses to any of these items, the Aides will not be allowed to provide services at the Community.

**B.    Additional Requirements for Proxy Caregivers**

1. All Proxy Caregivers must abide by the rules for Proxy Caregivers set forth at 111-8-100 et seq.

2. The Proxy Caregiver must be familiar with Community emergency evacuation routes.

3. The Proxy Caregiver must have documentation reflecting compliance with the provisions of the Rules for Proxy Caregivers, Chapter 111-8-100.

4. The Proxy Caregiver must maintain documentation of the performance of health maintenance activities, which complies with the Rules for Proxy Caregivers. The documentation must be provided to the Community to maintain in the Resident's chart.

**C. General Policies**

1. Aides must provide Residents with quality care and be kind, respectful, and friendly to the residents, their visitors, and staff members, etc.
2. Aides must follow the rules and policies of the Community in the performance of their duties.
3. All Aides are independent contractors and are not employees of the Community.
4. The Community reserves the right to prohibit any Aide from Community property with or without cause.

**D. Entering and Exiting the Community**

1. Do not report for duty at the Community if you have a communicable/contagious disease.
2. Enter and exit the Community by the front lobby entrance only.
3. Sign in and out at the front door when entering or departing the Community.
4. Leave Community premises when not on duty with the assigned Resident.
5. Observe all posted speed limits and traffic regulations.

**E. Communicating with Community Staff**

1. Aides are expected to devote full time to the Resident. Visiting with other residents, employees or other Aides is prohibited. No lingering at nurse's station, in hallways, dining room or away from their Aides posts.
2. Do not discuss Resident's condition, situation, diagnosis with anyone while on or off duty due to resident confidentiality. Any inquiries should be referred to the General Manager.
3. Aides should contact Department Managers to obtain services from another department for their Resident.
4. You must notify the Unit Coordinator or the On Call Nurse if you are leaving the resident alone for any reason.
5. Report any unusual behavior, symptoms, skin tears, bruises, falls, complaints, or problems from the Resident or Resident's family to the General Manager, Unit Coordinator, or the On Call Nurse when they occur.
6. Maintain the Resident Care Log while on duty. When shift ends, turn log in to nurses' station.
7. No one but the Community staff is allowed in the kitchen. If you need anything from the kitchen, for your Resident, ask a Community staff member to obtain it for you. The possibility of cross-contamination and the spread of infection are greater with each person that enters the kitchen area.
8. Aides should identify themselves to any Community staff member when asked.
9. If you have any problems with any Community staff member, do not argue with them. Instead, discuss the situation with the General Manager or Unit Coordinator who will investigate the circumstance.

**F. Prohibited Activities**

1. Do not go into the Apartments of other residents.
2. Do not discuss your personal problems with the residents.
3. No personal visits from children, family members or friends are permitted.

4. The Community is a smoke-free facility; you may smoke on your break at the outside designated area.
5. Solicitation, for any purpose, is not permitted on Community property.
6. No sleeping on duty. It is unprofessional and is not in the best interests of the Resident.
7. Personal calls are not permitted during duty hours. A personal cell phone may be used to make personal calls during your break or at mealtime. Do not make personal telephone calls from the Resident's Apartment or nurses' station at any time.

## G. Aide Meals

1. Aides must eat their meals in the Resident's Apartment, patio, or employee lounge. Aides may never eat meals at Resident's table in the dining room.
2. Aides must never eat anything from a resident's tray.
3. Meal tickets are available from the front office. If a meal is desired, contact the Department Manager before 10:00 am for lunch, and 3:30 pm for dinner. Any Aides' meals to be charged to Resident's account must be done by the Resident or Responsible Party.

## H. Attire

1. Aides must use good taste and judgment in dressing in neat, appropriate and professional attire. Clothes should be neat, clean and well pressed. Uniforms will be colors (not white) consisting of scrubs, dress, skirt/blouse or pant suit. No jeans, shorts, short skirts, halter tops, or tee shirts permitted.
2. Oversized purses, packages, packs and/or bags are not allowed and subject to search by security.
3. Aides must wear identification badges where name is visible at all times.

## I. Indemnity

1. The Community is not responsible for damage or losses due to theft while your vehicle is parked on the premises.
2. You agree to indemnify and hold the Community, its employees, and owners harmless from any and all liability and loss arising from your acts or omissions while you are at the Community.

**I agree to comply with the above rules and regulations regarding Private Duty Personnel.**


_____          _____

Private Duty Personnel                              Date

## **ACKNOWLEDGEMENT OF RECEIPT OF EXHIBIT E RULES AND PROCEDURES**
## **FOR PRIVATE DUTY PERSONNEL AND PROXY CAREGIVERS**

**RESIDENT/RESIDENT'S
REPRESENTATIVE**

**RESPONSIBLE PARTY**

Date
_____

Date
_____

Printed Name
_____

Printed Name
_____

Signature of Resident/Resident's
Representative*

Signature of Responsible Party in his/her
Individual Capacity

_____

_____

*Resident's Representative <u>understands</u>
and agrees that by signing this Residency
Agreement he/she is signing in both a
<u>representative and individual capacity.</u>

**COMMUNITY REPRESENTATIVE:**
Printed Name

Date

_____

_____

<u>Signature of Community Representative**</u>

**This individual is authorized to sign this Agreement and/or Exhibit on behalf of the Community as
defined on page 1 of the Residency Agreement.

## EXHIBIT F
## SMOKING POLICY

Smoking will not be permitted on the community campus. Failure to comply with the Community smoking policy may result in termination of residency. If you smoke and damage is caused by your smoking, then you agree to fully pay for any and all property damages caused by such smoking, and you agree to hold harmless and indemnify the Community for any personal injuries to you or any other person caused by such smoking, even if such property damages or personal injuries are allegedly caused by the active or passive negligence of the Community, its employees, officers or agents.

### ACKNOWLEDGEMENT OF RECEIPT OF EXHIBIT F
### SMOKING POLICY

**RESIDENT/RESIDENT'S
REPRESENTATIVE**

**RESPONSIBLE PARTY**

_____
Date

_____
Date

_____
Printed Name

_____
Printed Name

_____
Signature of Resident/Resident's
Representative*

_____
Signature of Responsible Party in his/her
Individual Capacity

*Resident's Representative understands
and agrees that by signing this Residency
Agreement he/she is signing in both a
representative and individual capacity.

**COMMUNITY REPRESENTATIVE:**

_____
Printed Name

_____
Date

_____
Signature of Community Representative**

**This individual is authorized to sign this Agreement and/or Exhibit on behalf of the Community as defined on page 1 of the Residency Agreement.

**EXHIBIT G**
**MOTORIZED VEHICLE POLICY AND WAIVER**

The Resident and the Community agree that the Resident shall be entitled to use an electric wheelchair, motorized cart, or similar device (a "Motorized Vehicle") in the Community so long as this Agreement remains in force upon the following terms. The Motorized Vehicle Policy is designed to protect residents and staff.

**A. Permit Requirement**

1. Any resident who wishes to operate a Motorized Vehicle at the Community must first apply for, and receive, a permit from the Community (a "Permit").

2. In order to receive a Permit, the Resident must obtain and submit to the General Manager a written statement by a physician indicating that the resident's use of a Motorized Vehicle is a medical necessity.

3. The Community shall administer an initial operating test to the Resident prior to issuing the Permit. Additional operating tests shall be administered if in the Community's opinion such tests are deemed necessary. The Community may, at any time, revoke or restrict a Resident's Permit if the Resident fails to follow or becomes incapable of following the Motorized Vehicle Policy.

4. Residents requesting any reasonable accommodation in the Community's Motorized Vehicle Policy shall submit a written request to the General Manager.

**B. Driving and Parking**

1. The Residents shall operate the Motorized Vehicle in a conservative and safe manner to avoid causing any personal injury or property damage, taking special precautions near doorways, at corners, when approaching pedestrians, when backing up, and in other situations that present an additional risk of injury or alarm to others in the vicinity. The Resident must be particularly careful to avoid persons who are entering or leaving their suites.

2. Pedestrians shall always have the right of way over Motorized Vehicles, whether indoors or outdoors.

3. No Motorized Vehicle shall be operated at the Community at a speed that exceeds a normal walking pace, estimated at 2 miles per hour. When going around corners, Motorized Vehicles should be driven at one half of that speed.

4. The Motorized Vehicle should be driven in the center of the hallway. The Resident must stop at hallway intersections, look both ways, and make sure it is clear before slowly proceeding through the intersection.

5. Motorized Vehicles shall not be operated in, and can be permanently excluded from, certain areas of the Community at times when, in the judgment of the Community, the presence or operation of a Motorized Vehicle presents a danger of injury to other residents, visitors, or staff [e.g., crowded areas, certain elevators, parts of dining rooms, confined or uneven areas]. The Community shall designate any such areas and/or times in writing.

6. If a Resident is not allowed to use a Motorized Vehicle in a particular area or at a particular time, the Resident shall park the Motorized Vehicle in the nearest area designated by the Community as suitable for parking such Motorized Vehicles, and transfer to a chair, walker, wheelchair, or other equipment or furnishing; if the Resident needs assistance in transferring, Staff will assist subject to reasonable prior notice and availability.

7. Motorized Vehicles shall be parked only in designated areas and shall neither block the ingress or egress of any person, nor be operated or stopped in any place or position that creates a trip hazard to any person.

8. The Motorized Vehicle must not be left unattended near any entrances, exits or intersections. When the Resident retires to his/her Apartment, he/she must also bring the Motorized Vehicle inside.

## C. Liability and Waiver

1. While not required, the Community recommends that the Resident obtain general liability insurance covering the operation of the Motorized Vehicle, as the Resident is responsible and liable for any and all damage and injuries resulting from the Resident's operation of the Motorized Vehicle. Without such insurance, Resident may be personally liable for substantial amounts of money plus attorneys' fees.

2. **Personal Injury and Property Damage Waiver and Release of Liability.** In consideration of the opportunity afforded to the Resident by the Community to operate a Motorized Vehicle, the Resident hereby assumes all liability and voluntarily release the Community owner and/or manager, its members, officers, directors, agents, employees and representatives, from any and all claims of any kind that the Resident may have against any or all of them for injury, death or damage to my property, arising out of or related to the operation of said Motorized Vehicle, and release them from such claims, including claims that may arise from the active or passive negligence of the Community owner and/or manager, its members, officers, directors, agents, employees and representatives. This waiver and release shall be binding upon the Resident's heirs, beneficiaries and personal representatives.

## ACKNOWLEDGEMENT OF RECEIPT OF EXHIBIT G
## MOTORIZED VEHICLE POLICY AND WAIVER

**I ACKNOWLEDGE THAT I HAVE CAREFULLY READ THIS DOCUMENT AND FULLY UNDERSTAND AND AGREE TO ITS TERMS. I UNDERSTAND THAT BY SIGNING THIS DOCUMENT, I AM VOLUNTARILY AND KNOWINGLY GIVING UP LEGAL REMEDIES THAT MIGHT OTHERWISE BE AVAILABLE TO ME.**

**RESIDENT/RESIDENT'S REPRESENTATIVE**

**RESPONSIBLE PARTY**

_____

_____

Date

Date

_____

_____

Printed Name

Printed Name

_____

_____

Signature of Resident/Resident's
Representative*

Signature of Responsible Party in his/her
Individual Capacity

*Resident's Representative understands
and agrees that by signing this Residency
Agreement he/she is signing in both a
representative and individual capacity.

**COMMUNITY REPRESENTATIVE:**

_____

_____

Printed Name

Date

_____

Signature of Community Representative**

**This individual is authorized to sign this Agreement and/or Exhibit on behalf of the Community as defined on page 1 of the Residency Agreement.

**EXHIBIT H**
**PHOTOGRAPHY/MARKETING MATERIAL**

Please indicate below whether you agree to allow the Community to take photographs of you and to use such photographs for identification in your medical records and/or in the Community's marketing material.

- Medical Record Identification:   I agree_____.  I do not agree_____.

- Marketing Materials:            I agree_____.  I do not agree_____.

**ACKNOWLEDGEMENT OF RECEIPT OF EXHIBIT H**
**PHOTOGRAPHY/MARKETING MATERIAL**

**RESIDENT/RESIDENT'S**
**REPRESENTATIVE**                              **RESPONSIBLE PARTY**

_____              _____
Date                                          Date

_____              _____
Printed Name                                  Printed Name

_____              _____
Signature of Resident/Resident's              Signature of Responsible Party in his/her
Representative*                               Individual Capacity

*Resident's Representative understands
and agrees that by signing this Residency
Agreement he/she is signing in both a
representative and individual capacity.

**COMMUNITY REPRESENTATIVE:**

_____              _____
Printed Name                                  Date

_____
Signature of Community Representative**

**This individual is authorized to sign this Agreement and/or Exhibit on behalf of the Community as defined on page 1 of the Residency Agreement.

## EXHIBIT I
## COMMUNITY OUTING LIABILITY RELEASE

    **A.**   **WAIVER AND RELEASE.** During the Resident's stay at the Community there may be occasions where the Resident leaves the Community. For example, the Resident may leave the community with a friend or family member or the Resident may leave the Community on a planned Community outing. The Resident, Resident's Representative, Responsible Party, and any other person signing this Waiver and Release personally or on behalf of the Resident (the " Releasors" ) hereby agree that the Community, its officers, employees, managers or agents (the "Releasees") shall not be liable or responsible in any way for any loss, injury, death, or other damage to the Resident, or be subject to any claim or demand for such loss, injury, death, or damage, whatsoever, **including, without limitation, those damages from acts of passive or active negligence on the part of the Releasees** which occurs any time the Resident is away from the Community for any reason, including participating in a planned Community outing, whether the loss, injury, death or other damage occurs while the Resident is still on the Community property or has left the property. The Releasors do hereby expressly forever release and discharge the Releasees from all such claims, demands, and causes of action for any losses, injuries, death, or damages. The Resident assumes full risk for any loss, injury, death, or damage which may occur while Resident is away from the Community for any reason, including any time the Resident is participating in a planned Community outing, whether the Resident has left the Community property or not. This Waiver and Release shall remain in full force and effect during the entire length of the Resident's stays at the Community and shall cover any time the Resident leaves the Community for any reason, including any time the Resident is participating in a planned Community outing, whether the Resident has left the Community property or not.

    The Releasors further expressly agree that the foregoing Waiver and Release is intended to be as broad and inclusive as is permitted by the law of the State in which the Community is located. Further, if any portion of this Waiver and Release is held invalid and unenforceable for any reason, it is agreed that the balance shall continue in full legal force and effect. If it is determined that any of the Releasees is subject to a claim or demand for any loss, injury, death, or damage described herein, then such claim or demand shall be governed under the terms of the Voluntary Binding Arbitration Agreement to the extent it is executed.

    **B.**   **ACKNOWLEDGEMENT.** The Releasors hereby acknowledge that he, she, or they have carefully read the contents of this Waiver and Release and fully understand and agree to the terms and conditions of this Waiver and Release. The Releasors further understand that other Communities may not require Releasors to sign a Community Outing Liability Release and that the Resident has the right to choose to live in such other personal care homes.

**[THIS SPACE INTENTIONALLY LEFT BLANK]**

## <u>ACKNOWLEDGEMENT OF RECEIPT OF EXHIBIT I</u>
## <u>COMMUNITY OUTING LIABILITY RELEASE</u>

**RESIDENT/RESIDENT'S
REPRESENTATIVE**

**RESPONSIBLE PARTY**

_____
Date

_____
Date

_____
Printed Name

_____
Printed Name

_____
Signature of Resident/Resident's
Representative*

_____
Signature of Responsible Party in his/her
Individual Capacity

*Resident's Representative <u>understands</u>
and agrees that by signing this Residency
Agreement he/she is signing in both a
<u>representative and individual capacity.</u>

**COMMUNITY REPRESENTATIVE:**

_____
Printed Name

_____
Date

_____
Signature of Community Representative**

**This individual is authorized to sign this Agreement and/or Exhibit on behalf of the Community as
defined on page 1 of the Residency Agreement.

**EXHIBIT J**
**BENEFICIARY DESIGNATION FORM**

I designate the following beneficiary(ies) in the event of my death or incapacitation. My beneficiary(ies) are authorized to receive all of my personal belongings, Resident Trust Funds, and refunds, in the event of my death or incapacitation.

**Primary Beneficiary:**

_____          _____
Print Name                                                       Relationship

_____
Primary Beneficiary's Address

**Contingent Beneficiary:**

_____          _____
Print Name                                                       Relationship

_____
Contingent Beneficiary's Address

**RESIDENT/RESIDENT'S REPRESENTATIVE**                    **RESPONSIBLE PARTY**

_____          _____
Date                                                                   Date

_____          _____
Printed Name                                                    Printed Name

_____          _____
Signature of Resident/Resident's                     Signature of Responsible Party in his/her
Representative*                                                 Individual Capacity

*Resident's Representative <u>understands</u>
and agrees that by signing this Residency
Agreement he/she is signing in both a
<u>representative and individual capacity.</u>
**COMMUNITY** REPRESENTATIVE:

_____          _____
Printed Name                                                    Date

_____
Signature of Community Representative**

**This individual is authorized to sign this Agreement and/or Exhibit on behalf of the Community as defined on page 1 of the Residency Agreement.

**EXHIBIT K**
**RESIDENT RIGHTS**

**Georgia Department of Community Health**
**111-8-62-.25 Residents' Rights.**

(1) The home must operate in a manner that respects the personal dignity of the residents and the human rights of the residents, which rights cannot be waived, except as provided in these rules by the resident or the resident's representative or legal surrogate.

(a) Each resident must receive care, and services which must be adequate, appropriate, and in compliance with applicable federal and state law and regulations.

(b) The home, its agents or employees, must not punish or harass the resident, because of the resident's efforts to enforce his or her rights.

(c) Each resident must have the right to:

1. Exercise the constitutional rights guaranteed to citizens of this state and this country including, but not limited to, the right to vote.

2. Choose activities and schedules consistent with the resident's interests and assessments.

3. Interact with members of the community both inside and outside the home and to participate fully in the life of the community.

4. Make choices about aspects of his or her life in the home that are significant to the resident.

(d) Each resident must have the right to enjoy privacy in his or her room; home personnel and others must respect this right by knocking on the door before entering the resident's room.

(e) Each resident must have the right to associate and communicate freely and privately with persons and groups of the resident's choice without being censored by staff.

(f) Each resident must be treated with dignity, kindness, consideration and respect and be given privacy in the provision of personal care. Each resident must be accorded privacy and freedom for the use of bathrooms at all hours.

(g) No religious or spiritual belief or practice may be imposed upon any resident. Residents must be free to practice their religious beliefs as they choose. Each resident must have the right to participate in social, religious, and community activities that do not interfere with the rights of other residents.

(h) Each resident has the right to be free from mental, verbal, sexual and physical abuse, neglect and exploitation. Each resident has the right to be free from actual or threatened physical or chemical restraints and the right to be free from isolation, corporal or unusual punishment and interference with the daily functions of living, such as eating or sleeping.

(i) Each resident has the right to use, keep and control his or her own personal property and possessions in the immediate living quarters, except to the extent a resident's use of his or her property would interfere with the safety or health of other residents. Each resident has the right to reasonable safeguards for the protection and security of his or her personal property and possessions brought into the home.

(j) Each resident's mail must be delivered unopened to the resident on the day it is delivered to the home. Each resident's outgoing correspondence may not be opened or tampered with prior to being mailed or otherwise delivered.

(k) Each resident must have access to a telephone and the right to have a private telephone, at the resident's own expense. Telephones must be placed in areas to insure privacy without denying accessibility.

(l) Each home must permit immediate access to residents by others who are visiting with the consent of the resident. Residents have the right to have visitors at mutually agreed upon hours. Once the hours are agreed upon, no prior notice is necessary. Each resident has the right to refuse to see visitors or terminate any visit.

(m) Each resident has the right to manage his or her own financial affairs, including the right to keep and spend his or her own money unless that resident has been adjudicated incompetent by a court of competent jurisdiction. Each resident has the right to be free from coercion to assign or transfer to the home money, valuables, benefits, property or anything of value other than payment for services rendered by the home.

(n) Each resident has the right to a personal needs allowance for the free use of the resident in the amount of twenty dollars per week to be distributed by the administrator, on-site manager, or a responsible staff person in the home unless waived by the resident. The following conditions must be met regarding the personal needs allowance:

1. The personal needs allowance must be included as a charge for services to each resident's account which a resident or a resident's representative or legal surrogate, if any, may waive by signing a written waiver upon admission or anytime thereafter. No allowance charge may be assessed where a resident or a resident's representative or legal surrogate, if any, has signed a written waiver of the personal needs allowance. Such a waiver must be kept in a resident's file.

2. Where no waiver has been signed, the personal needs allowance must be tendered to each resident, in cash, on the same day each week.

3. The personal needs allowance must not be intended or needed for purchasing necessary goods such as toilet paper and light bulbs which the home ordinarily supplies, and must in no way relieve the home of the obligation to insure that such necessary goods are available to the resident.

(o) Each resident has the right to receive or reject medical care, dental care, or other services except as required by law or regulations.

(p) Each resident has the right to choose and retain the services of a personal physician and any other health care professional or service. No home is permitted to interfere with the resident's right to receive from the resident's attending physician complete and current information concerning the resident's diagnosis, treatment and prognosis. Each resident and his or her representative or legal surrogate, if any, has the right to be fully informed about care and of any changes in that care and the right of access to all information in medical records retained in the home.

(q) Each resident has the right to fully participate in the planning of his or her care. Case discussion, consultation and examination shall be confidential and conducted discreetly. A person who is not directly involved in the resident's care may be present when care is being rendered only if he or she has the resident's permission.

(r) Each resident has the right to inspect his or her records on request. Each resident has the right to make a copy of all records pertaining to the resident. Each resident has the right to confidential treatment of personal information in the resident file.

(s) Each resident who has not been committed to the home by court order or who does not have a representative or legal surrogate with specific written authority to admit, transfer or discharge, may discharge or transfer himself or herself upon notification to the home in conformance with the home's policies and procedures.

(t) Each resident has the right to access to the State Long-Term Care Ombudsman Program O.C.G.A. § 31-8-50et seq. and the name, address, and telephone number of the ombudsman must be posted in a common area of the home.

(u) Residents have the right to form a Resident Council and have meetings in the home outside the presence of owners, management or staff members of the home.

(v) Each resident has the right to file a complaint with the Department concerning care being provided in the home that violates these rules. The home must post the name of the Department and the address and telephone number where licensing complaints are received in the common area of the home.

(2) Each resident must be provided, at the time of admission to the home, with a copy of the Resident's Bill of Rights, as provided in Rule 111-8-62-.25 which must include provisions of protecting the personal and civil rights of each resident. In the event that a resident is unable to read the Resident's Bill of Rights the manager must take special steps to assure communication of its contents to the resident.

(3) A personal care home must comply with the provisions of the "Remedies for Residents of Personal Care Homes Act" as outlined in O.C.G.A. § 31-8-131et seq.

**[THIS SPACE INTENTIONALLY LEFT BLANK]**

## <u>ACKNOWLEDGEMENT OF RECEIPT OF EXHIBIT K</u>
## <u>RESIDENT RIGHTS</u>

**I, the undersigned, do hereby state that I have received a copy of the Resident Rights for the State of Georgia.**

**RESIDENT/RESIDENT'S
REPRESENTATIVE**

**RESPONSIBLE PARTY**

_____
Date

_____
Date

_____
Printed Name

_____
Printed Name

_____
Signature of Resident/Resident's
Representative*

_____
Signature of Responsible Party in his/her
Individual Capacity

*Resident's Representative <u>understands</u>
and agrees that by signing this Residency
Agreement he/she is signing in both a
<u>representative and individual capacity.</u>

**COMMUNITY REPRESENTATIVE:**

_____
Printed Name

_____
Date

_____
Signature of Community Representative**

**This individual is authorized to sign this Agreement and/or Exhibit on behalf of the Community as defined on page 1 of the Residency Agreement.

**EXHIBIT L**
**CRITERIA FOR ADMISSION TO AND CONTINUED RESIDENCY AT A**
**PERSONAL CARE HOME**

**A.** **An individual must meet all of the following minimum criteria in order to be** *admitted* **to a Personal Care Home:**

(a) Be at least 18 years of age.

(b) The home is permitted to admit and retain only ambulatory residents who are capable of self-preservation with minimal assistance, i.e. staff may assist the resident in transferring from a sitting or reclining position and provide verbal directions to residents who are able to self-propel to the nearest exit.

(c) The home must not admit or retain persons who require the use of physical or chemical restraints, isolation, or confinement for behavioral control.

(d) No home is permitted to admit residents who either require continuous medical services or continuous nursing care and treatment.

(e) Medical, nursing, health or therapeutic services required on a periodic basis, or for short-term illness, must not be provided as services of the home. When such services are required, they must be purchased by the resident or the resident's representative or legal surrogate, if any, from appropriately licensed providers managed independently from the home. The home may assist in arrangement for such services, but not provision of those services.

**If you or your Responsible Party become aware, at any time, that you do not meet the criteria listed above for admission to, or continued residency in, this Community, you and your Responsible Party agree to promptly, and without any delay, notify the General Manager in writing.**

## ACKNOWLEDGEMENT OF RECEIPT OF EXHIBIT L CRITERIA FOR ADMISSION AND CONTINUED RESIDENCY AT A PERSONAL CARE HOME

**RESIDENT/RESIDENT'S REPRESENTATIVE**

**RESPONSIBLE PARTY**

Date

Date

_____

_____

Printed Name

Printed Name

_____

_____

Signature of Resident/Resident's Representative*

Signature of Responsible Party in his/her Individual Capacity

_____

_____

*Resident's Representative understands and agrees that by signing this Residency Agreement he/she is signing in both a representative and individual capacity.

**COMMUNITY REPRESENTATIVE:**

_____

_____

Printed Name

Date

_____

Signature of Community Representative**

**This individual is authorized to sign this Agreement and/or Exhibit on behalf of the Community as defined on page 1 of the Residency Agreement.

**EXHIBIT M**
**<u>DO NOT RESUSCITATE ORDER & ADVANCED DIRECTIVES</u>**

The admission, care and treatment of a resident at this Community is not conditioned upon whether or not you have executed or waived a Do Not Resuscitate Order (DNRO).

It is the policy of the Community to follow any legally executed directive provided to us, including a Do Not Resuscitate Order (DNRO). All executed advance directives must be provided to the community at the time of move in.

If you have properly executed a DNRO, the Community must honor your wishes. In the event you experience a cardiopulmonary arrest, Community Staff trained in cardiopulmonary resuscitation (CPR), or a licensed health care provider present in the facility, may withhold CPR. If you are receiving hospice services and experience cardiopulmonary arrest, Community Staff must immediately contact hospice. Hospice procedures shall take precedence over those of the Community.

Under Georgia law, the Community shall not be subject to criminal prosecution or civil liability, nor be considered to have engaged in negligent or unprofessional conduct, for following the procedures set forth in this Exhibit, which involve withholding or withdrawing CPR pursuant to a DNRO.

Please Initial:

As indicated below by my initials, the Community has been provided with a copy of the following advanced directives:

_____  Power of Attorney (Health Care and/or Financial)
_____  Advance Directive for Healthcare
_____  Guardianship
_____  Do Not Resuscitate Order (DNRO)
_____  Other _____

_____  I do not have advance directives to provide at this time. In the event that I execute advance directives, I agree to immediately notify and provide a copy of the advance directives to:

_____  at the Community.

_____  This Community does not provide residents with a DNRO, but I have been advised that I can obtain Do Not Resuscitate Order Form, if desired, from:
http://aging.dhs.georgia.gov/sites/aping.georgia.gov/files/DNR-15.pdf

_____  I have been given information on Health Care Advance Directives and have been advised that I can obtain more information about Georgia's Advance Directive at:
http://aging.dhs.georgia.gov/sites/aging.georgia.gov/files/GEORGINY020AD VANCP/020DIRECTIVE%20FOR°/020HEALTH%2OCARE-2016.pdf

## ACKNOWLEDGEMENT OF RECEIPT OF EXHIBIT M
## DO NOT RESUSCITATE ORDERS & ADVANCED DIRECTIVES

Your signature below acknowledges that you have been informed of the policies regarding advance directives, DNRO Policy and Procedures and how to obtain further information, if needed.

**RESIDENT/RESIDENT'S REPRESENTATIVE**                         **RESPONSIBLE PARTY**

_____                    _____
Date                                                          Date

_____                    _____
Printed Name                                                  Printed Name

_____                    _____
Signature of Resident/Resident's                              Signature of Responsible Party in his/her
Representative*                                               Individual Capacity

*Resident's Representative <u>understands</u>
and agrees that by signing this Residency
Agreement he/she is signing in both a
<u>representative and individual capacity.</u>

**COMMUNITY REPRESENTATIVE:**

_____                    _____
Printed Name                                                  Date

_____
Signature of Community Representative**

**This individual is authorized to sign this Agreement and/or Exhibit on behalf of the Community as defined on page 1 of the Residency Agreement.

**EXHIBIT N**
**ADDITIONAL RULES AND PROCEDURES FOR PROXY CAREGIVERS**

In addition to those requirements set forth in Exhibit E, Proxy Caregivers designated by Residents to assist with Health Maintenance Activities must comply with the following requirements:

1. All Proxy Caregivers must abide by the rules for Proxy Caregivers set forth at 111-8-100 et seq.

2. The Proxy Caregiver must be familiar with Community emergency evacuation routes.

3. The Proxy Caregiver shall only be allowed to perform health maintenance activities for individuals with disabilities who are being served by the Community provided that the individual with a disability or legally authorized representative has executed a written informed consent.

4. Proxy Caregivers shall only be allowed to provide the following Health Maintenance Activities:

5. The Resident's Written Plan of Care must specify the Health Maintenance Activities to be performed, the frequency of training and evaluation for the proxy caregiver and the kinds of changes in the written plan of care that would necessitate additional training for the Proxy Caregiver.

6. If the Proxy Caregiver observes a change in the condition of the individual with a disability which may require evaluation/treatment by a licensed healthcare professional, or there is a change in the care being provided by the Community that might impact the performance of health maintenance activities, the Proxy Caregiver must notify the Community Director of Nursing of the change within 24 hours and report the change in the Resident's record.

7. The Proxy Caregiver must have documentation reflecting compliance with the provisions of the Rules for Proxy Caregivers, Chapter 111-8-100.

8. The Proxy Caregiver must maintain documentation of the performance of health maintenance activities, which complies with the Rules for Proxy Caregivers. The documentation must be provided to the Community to maintain in the Resident's chart.

9. The Proxy Caregiver must provide documentation signed by a licensed healthcare professional which reflects that the Proxy Caregiver has been determined to have the knowledge and skills necessary to perform safely the required health maintenance activities for the individual resident.

**I agree to comply with the above rules and regulations regarding Proxy Caregivers.**


_____        _____
Proxy Caregiver                                  Date

## <u>ACKNOWLEDGEMENT OF RECEIPT OF EXHIBIT N ADDITIONAL RULES AND PROCEDURES FOR PROXY CAREGIVERS</u>

**RESIDENT/RESIDENT'S REPRESENTATIVE**

**RESPONSIBLE PARTY**

_____
Date

_____
Date

_____
Printed Name

_____
Printed Name

_____
Signature of Resident/Resident's Representative*

Signature of Responsible Party in his/her Individual Capacity

*Resident's Representative <u>understands</u> and agrees that by signing this Residency Agreement he/she is signing in both a <u>representative and individual capacity.</u>

**COMMUNITY REPRESENTATIVE:**

_____
Printed Name

_____
Date

_____
Signature of Community Representative**

**This individual is authorized to sign this Agreement and/or Exhibit on behalf of the Community as defined on page 1 of the Residency Agreement.

**EXHIBIT O**
**GRIEVANCE PROCEDURE**

Each resident at the Community is encouraged and assisted, throughout his/her residency, to exercise the Resident's rights as a resident and citizen. To this end, a Resident and/or the resident's family may voice grievances and recommend changes in policies and services to the Community and/or outside representatives of their choice, free from restraint, interference, coercion, discrimination or reprisal.

The Resident has a right to make an oral or written complaint to the General Manager who must respond within 5 business days. Upon receipt of a grievance, the General Manager will conduct an investigation of the issue. The General Manager will inform the Resident and/or Responsible Party of the result of the investigation and of the action taken to remedy any findings.

Under no circumstances will the Resident who has a complaint be threatened by any type of reprisal or intimidation before, during, or after an investigation. Copies of all correspondence pertaining to the complaints will become part of the Community's permanent record.

Should they feel it necessary, the Resident or another concerned person may contact the Long Term Care Ombudsman Program in the county where the Community is located. The Local Ombudsman may be contacted at 1-866-991-9988.

If the problem is not resolved, the Resident may file a complaint with the Georgia Department of Community Health (DCH) at 404-657-5700.

**[SIGNATURES REQUIRED ON NEXT PAGE]**

## ACKNOWLEDGEMENT OF RECEIPT OF EXHIBIT O
## GRIEVANCE PROCEDURE

**RESIDENT/RESIDENT'S
REPRESENTATIVE**

**RESPONSIBLE PARTY**

_____
Date

_____
Date

_____
Printed Name

_____
Printed Name

_____
Signature of Resident/Resident's
Representative*

_____
Signature of Responsible Party in his/her
Individual Capacity

*Resident's Representative <u>understands</u>
and agrees that by signing this Residency
acknowledgment he/she is signing in both a
<u>representative and individual capacity.</u>

**COMMUNITY REPRESENTATIVE:**

_____
Printed Name

_____
Date

_____
Signature of Community Representative**

**This individual is authorized to sign this Agreement and/or Exhibit on behalf of the
Community as defined on page 1 of the Residency Agreement.

### ASPEN VILLAGE AT LOST MOUNTAIN ASSISTED LIVING, LLC
### d/b/a THE LODGE AT ASPEN VILLAGE   RESIDENT/REPRESENTATIVE
### OPTIONAL ARBITRATION AGREEMENT

*PLEASE READ CAREFULLY*

This Agreement is made between Aspen Village at Lost Mountain Assisted Living, LLC d/b/a The Lodge at Aspen Village ("Center"), its employees and agents, and _____ ("Resident") and/or _____ ("Resident's Durable Power of Attorney"/"Resident's Legal Guardian" /"Resident's Responsible Party/Resident's Agent" collectively referred to in this Agreement as "Representative"), on behalf of the Resident and in his/her individual capacity.

## A.  Consent to Arbitration

It is further understood that in the event of any controversy or dispute between the parties (with the exception of disputes regarding nonpayment by Resident and/or Representatives for payment due to Center, involuntary discharges, and any claims that could be properly adjudicated as a small claim in the appropriate court, excluding appeals therefrom, unless all parties involved agree to arbitrate such proceedings) arising out of or relating to Center's Residency Agreement, or breach thereof, or relating to the provisions of care or services to Resident, including but not limited to any alleged tort, personal injury, negligence or other claim; or any federal or state statutory or regulatory claim of any kind; or whether or not there has been a violation of any right or rights granted under state law (collectively "Disputes"), and the parties are unable to resolve such through negotiation, then the parties agree that such Dispute(s) shall be resolved by binding arbitration

## B.  Governing Law

The Parties acknowledge that this Agreement evidences a transaction involving interstate commerce and, as a result, is governed by the Federal Arbitration Act ("FAA"). The arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement including, but not limited to, any claim that all or any part of this Agreement is void or voidable.

## C.  Mutuality and Survival

It is the intention of the parties to this Agreement to bind not only themselves, but also their successors, assigns, heirs, personal representatives, guardians or any persons deriving their claims through or on behalf of Resident.

## D.  Arbitration Administration

[*Judicial Arbitration and Mediation Services ("JAMS") or the American Arbitration Association ("AAA")*] will administer this arbitration under its code of procedure. If [*JAMS or AAA*] is unable to administer the arbitration for any reason, then the [*other between Judicial Arbitration and Mediation Services ("JAMS") or the American Arbitration Association ("AAA")*)] will administer the arbitration

under its code of procedure. If [*JAMS or AAA*] is unable to administer the arbitration for any reason, then the arbitration will be conducted in accordance with the FAA.

### E.  Selection of Arbitrators

The parties agree that only one (1) arbitrator is required to resolve any Dispute(s) and the arbitrator shall be selected from the chosen administrator's list of panelists and agreed to by the parties.

In the event the parties are unable to agree on a single (1) arbitrator, or if otherwise required by law, then a panel of three (3) is to be used (each party will select one (1) arbitrator from the chosen administrator's list of panelists. The parties will then create a list of six arbitrators from the chosen administrator's list of panelists, with each party choosing three arbitrators. The two arbitrators previously selected by the parties will then choose the third arbitrator from the list of six. All arbitrators will be neutral arbitrators and must disclose all conflicts of interest or bias and otherwise comply with the American Bar Association Code of Ethics for Arbitrators in Commercial Disputes.

### F.  Venue

The place of arbitration shall be in the County where Center is located, or, if that is not practical, then by consent of the parties.

### G.  Waiver/Statute of Limitations

A claim for arbitration shall be waived and forever barred if not timely filed in accordance with state law for the commencement of a civil action concerning the subject matter of the claim.

### H.  Fees and Costs

The arbitrator's compensation and administrative fees related to the arbitration shall initially be paid by Center. If the Center prevails, then the arbitrator may order that Resident/Representative reimburse Center for all or part of any compensation or administrative fees paid.

If the parties cannot agree to a single arbitrator, then each party shall bear the costs of their selected arbitrator's compensation and administrative fees, and will pay half of the neutral's costs and fees. The panel may order the non-prevailing party to reimburse the prevailing party for all or part of any compensation or administrative fees paid.

Each party shall be responsible for their own attorneys' fees.

### I.  Final Judgment

The arbitrator shall hear and decide the controversy, and the decision **shall be binding** on all parties, and may be entered as a final judgment by a court of competent jurisdiction.

### J.  Severability

In the event that any part of this Agreement is determined to be unenforceable, the remaining portions of the Agreement shall remain valid and shall be enforced by the parties.

## K.  Jury Waiver and Acknowledgments

**I understand and agree that I am giving up and waiving the right to a Jury trial, as well as any appeal from a decision or reward of damages.**

It is further understood by Resident/Representative that he or she is not required to use this Center for his/her healthcare needs, and that there are numerous other health care providers where Center is located that are qualified to provide such care. It is further understood that (1) this Agreement to Arbitrate is a separate and stand-alone contract from the Residency Agreement; (2) admission to the Center is in no way contingent upon Resident signing this Agreement; and (3) Resident has the right to seek legal counsel concerning this agreement.

This Agreement shall remain in effect for all care rendered at Center. Resident/Representative shall have the right to opt out of this Agreement to arbitrate by providing written notice of its intention to do so to Center within thirty (30) days of the execution of the contract.


_____                    _____
Resident/Representative Signature                          Date


_____                    _____
Print Name of Resident/Representative                   Title


_____                    _____
Authorized Agent of Center                                   Date

_____                    _____
Printed Name                                                      Title

**IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION**

IN RE:

**ASPEN VILLAGE AT LOST MOUNTAIN
ASSISTED LIVING, LLC,**

       **Debtor.**

**CHAPTER 11**

**CASE NO. 19-40262-BEM**

**CERTIFICATE OF SERVICE**

This is to certify that I have on this day electronically filed the foregoing **Supplement to Disclosure Statement** using the Bankruptcy Court's Electronic Case Filing program, which sends a notice of and an accompanying link to this document to the following parties who have appeared in this case under the Bankruptcy Court's Electronic Case Filing Program:

- Francesca Macchiaverna: fmacchiaverna@huntermaclean.com; btees@huntermaclean.com;

- Martin P. Ochs: martin.p.ochs@usdoj.gov.

This 2nd day of July, 2019.

               **JONES & WALDEN, LLC**

               */s/ Leslie Pineyro*
               Leslie Pineyro
               Georgia Bar No. 969800
               21 Eighth Street, NE
               Atlanta, Georgia  30309
               (404) 564-9300
               Attorneys for Debtors in Possession
               lpineyro@joneswalden.com